1 A.3d 507

Tranell DANSBURY

v.

STATE of Maryland.

No. 1464, Sept. Term, 2008.

Court of Special Appeals of Maryland.

July 6, 2010.

Reconsideration Denied Sept. 14, 2010.

**720**

Michael E. Thakur of Washington D.C. (Elizabeth Julian, Acting Public Defender of Baltimore, MD, O'Melveny & Myers LLP of Washington D.C., on the brief), for appellant.

Michelle W. Cole (Douglas F. Gansler, Atty. Gen., on the brief) Baltimore, MD, for appellee.

Panel: HOLLANDER, *JAMES P. SALMON, J. FREDERICK SHARER, (Retired, specially assigned), JJ.

HOLLANDER, J.

Following a trial in June 2008, a jury in the Circuit Court for Baltimore City convicted Tranell Dansbury, appellant, of one count of second degree rape of Shallie M. ("Ms. M."). The incident occurred more than eleven years earlier, on November 17, 1997, when Ms. M. was eighteen years old and appellant was fifteen. The jury also convicted appellant of related offenses, including one count of second degree sexual offense; two counts of fourth degree sexual offense, and three counts of second degree assault.[1] The court subsequently

---

* James P. Salmon, J., participated in the hearing and conference of this case while an active member of this Court; he participated in the adoption of this opinion as a specially assigned member of this Court.

1. Appellant was acquitted of first degree rape; sexual offense in the first degree; two counts of sexual offense in the third degree; four counts of first degree assault; one count of second degree assault; use of a handgun in the commission of a felony; wearing, carrying or transporting a handgun; robbery with a dangerous weapon; robbery; theft under $300; and wearing and carrying openly a dangerous and deadly weapon. For sentencing, the court merged the convictions for

sentenced appellant to a total of thirty years imprisonment.[2]

On appeal, appellant poses two questions, which we quote:

1. Did the trial court err by giving a missing witness instruction over the defense counsel's multiple objections and drawing the jury's attention to the fact that particular defense witnesses were not called to testify without inquiring whether such witnesses were peculiarly available to the Appellant?

2. Did the trial court err in permitting an inconsistent jury verdict of guilty on three charges of second degree assault and not guilty of one charge of second degree [assault] when the charging documents and the verdict sheet do not differentiate among different acts that could be the basis for separate assault charges?

For the reasons set forth below, we answer the first question in the affirmative and shall reverse and remand. Because the second question is not likely to recur on remand, we decline to address it.

## FACTUAL AND PROCEDURAL BACKGROUND

At trial, Baltimore City Police Detective Chester Norton testified that he worked in the Sex Crimes Unit from 1998 to July 2007. He became involved in this case on April 9, 2007, when he received a DNA match linking appellant's DNA to vaginal swabs obtained from Ms. M. on November 18, 1997, shortly after she reported that she was raped. Detective Norton explained that he then contacted Ms. M. in California and interviewed her on the telephone. Ms. M. told him that

sexual offense in the fourth degree into the second degree rape conviction and combined all second degree assault convictions.

2. At sentencing on July 30, 2008, the trial judge merged two of the three second degree assault convictions and the fourth degree sexual offense conviction with the second degree rape conviction. The trial judge sentenced appellant to twenty years imprisonment for second degree rape; a concurrent sentence of twenty years for the second degree sexual offense; and a consecutive term of ten years for second degree assault.

she had been raped in November 1997; she was also forced to perform fellatio; and the assailant had a gun. Detective Norton indicated, without objection, that what Ms. M. told him on the phone was consistent with what she had reported in 1997.

Ms. M. returned to Baltimore in August 2007 in connection with the investigation. According to Detective Norton, Baltimore City detectives Joseph Peters and Caprice Smith showed her a photo array on August 3, 2007.[3] The investigators also obtained a search warrant to "get a confirmation swabbing of the defendant, to compare it against the case evidence to be sure."

Detective Smith, of the Sex Offense Unit, testified that she was a witness to a six-person photo array at which Ms. M. identified the person depicted in photograph five as the individual who attacked her. She also indicated that Ms. M. signed her name next to the photograph. However, Detective Smith did not know whether photograph five depicted appellant.

Reginald Webb testified that he is the father of Ms. M.'s children, has known her since 1996, and they are friends. According to Mr. Webb, in a telephone conversation with Ms. M. on the night of November 17, 1997, she told him she was going to take a cab from her aunt's house on Washington Street to his mother's house, which was nine or ten blocks away on Monument Street. Mr. Webb recalled that "[t]ime just started going by and she wasn't there yet. . . ." Noting that Ms. M. is a "prompt person", Mr. Webb thought that perhaps she had started walking while "trying to flag a cab down." Mr. Webb called Ms. M.'s aunt, who indicated that Ms. M. had left about thirty minutes earlier. Mr. Webb then "waited some more," but Ms. M. "never came." He went outside to look for Ms. M. but did not see her, so he again called Ms. M.'s aunt. She indicated that she had not seen Ms.

---

3. Detective Norton did not discuss the results of the photo array in his testimony.

M. since she and Webb last spoke. Webb again walked outside, and this time he saw Ms. M. He recalled:

[She] was running into [his] mother's backyard, and she didn't have on any pants, no pants, no shoes, she was crying. She had dirt all over her face, and her shirt was like real wet. So I grabbed and pulled her in the house, and I was asking what happened. And when she got in the house, she just—she collapsed, she fell, and I didn't know what was going on.

She was trying to talk, but she couldn't talk. So I went and got a washcloth, and wiped her face off, and when I got close to her, I could smell her, she smelt [sic] like urine. So I had called the police, and the ambulance, and the police had came over. And she was telling me that—she was trying to say that she had got raped, but she couldn't. I don't know if she was in shock or what was going on. But she was shaking like she was outside in the cold, so she couldn't get it out.

According to Mr. Webb, on the night in question, Ms. M. recounted the details of what had occurred. He stated, without objection:

She had told me that she called a cab, and she said that she left out, and the cab had came, but it kept going. And then she said she tried to flag a couple of cabs down, they wouldn't stop. So she said she started walking. . . . And she said when she got near Church Square Mall, she said this guy came up behind her and told her to come here. And she said no. And she said he put a gun to her back, and made her walk over . . . [to] Water Towers. I think it's a retirement home or something like that.

And there's a wall over there, she said he made her walk behind the wall, and she kept telling him she didn't want to go with him, and she said she started screaming out for help, there's nobody outside, and he told her if she kept screaming, he was going to hurt her. Took her behind the wall, and she said he pushed her on the ground, and made her give him oral sex, and took her pants off, and . . . he

urinated on her, he had—he tried to have sex with her anally, and he didn't, but he had sex with her vaginally, and he took—after—she said he put dirt in her mouth and put a sock in her mouth while he was doing it.

And I remember her saying that he kept telling her over and over again, that she was his girlfriend or something like that. And she said she heard some police cars or squad cars, something, a siren, and he stopped, and she said she had a bag of clothes, because she had went shopping, and he took the clothes, and he walked off, and she said, once he left, she said she laid there for, I don't know how long, but she got up, and looked around the wall, to see if he was there, and he wasn't, and that's when she said she ran to my mother's house.

Jennifer Ingridson, a DNA analyst for the Baltimore City Police Department, testified as an expert in serology. In April 2003, Ms. Ingridson analyzed swabs that were taken from Ms. M.'s vagina in the early morning hours of November 18, 1997. Her report of April 28, 2003, was admitted into evidence. According to Ms. Ingridson, the "testing of the vaginal swabs revealed that there was seminal fluid present, as well as sperm." The State also introduced Ms. Ingridson's report of November 2007, containing serological findings as to the underwear worn by Ms. M. on the night of the alleged attack. Ms. Ingridson noted that "[t]wo of the stains were positive for the presence of creatine, which is just the possible presence of urine." [4]

Jocelyn Carlson, of the Baltimore City Police Department, testified as an expert in DNA analysis. She analyzed the "suspect standard," and then compared it to the vaginal swabs previously analyzed" by BRT Laboratories ("BRT").[5] Ms. Carlson testified:

---

**4.** Ingridson did not submit Ms. M.'s underwear for DNA analysis.

**5.** As reflected in State's Exhibit 4, the parties stipulated to vaginal swabs and oral swabs that were submitted to BRT. According to the stipulation, "BRT Laboratories developed three complete DNA profiles,

The sperm fraction of the vaginal swab A from BRT, which is in my table, sample 2S, yielded a DNA profile consistent with the known standard from Tranell Dansbury. The chan[c]es of selecting an unrelated individual from a random population, possessing a stained profile as the evidence sample at the tested LOSI [sic] are approximately 1 in 74.6 quintillion individuals in the American Caucasian population, 1 in 6.99 quintillion individuals in the African American population, and 1 in 164 quintillion individuals in the southeast Hispanic American population.

\* \* \*

Basically that means that [appellant's] profile, all the alleles he has matched all the alleles that were in the sperm fraction of the vaginal swabs, and the statistics are such that it's highly unlikely that anyone else would've developed— would've contributed to that profile. A quintillion is a very large number, and the population of Earth right now is only 6.5 billion.

But, Ms. Carlson indicated that the sample also "contained a minor allele." The following exchange is relevant:

[APPELLANT'S COUNSEL]: So it's my understanding that [the minor allele] could indicate another person; is that correct?

[MS. CARLSON]: Minor alleles are just when the amount of DNA has not reached the same level as the amount from another person.

In this case, the sperm fraction sample that [the prosecutor] was talking about, there was one minor allele.

[APPELLANT'S COUNSEL]: So let me understand that, basically would it be fair to say that you cannot say that that minor allele of sperm belongs to Tranell Dansbury; is that correct?

---

... which were those of the reported victim and the profile of a male contributor." BRT submitted its findings to the police on June 12, 2003. BRT's report, dated June 12, 2003, was admitted into evidence as State's Exhibit 5.

[MS. CARLSON]: Well, that minor allele does not belong to Tranell, yes.

Mary Davidson testified that she has worked as a "SAFE" [6] nurse since 1994. She explained that "[a] safe nurse is a nurse who has a special training in collecting evidence from persons who report sexual assault. [Safe nurses] also treat the persons . . . for exposure to sexually transmitted diseases, and connect them with crisis centers."

Davidson met with Ms. M. at around 5:15 a.m. on November 18, 1997, and examined her shortly afterwards. Davidson documented that Ms. M.'s clothes were "wet and stained and covered with debris," and she collected Ms. M.'s bra and shirt. In addition, Ms. M. had "foreign material collected, debris, which was inside the labia majora, the oral cavity and her hair." Ms. M. also "had a crusty drainage around her anus that was collected." According to Davidson, Ms. M. suffered some genital injuries, including lacerations to her posterior forchette, which is a "little area below the vagina opening, but not at the anal opening."

State's Exhibit 8 was a copy of Ms. M.'s medical record, which included Davidson's notes from her interview of Ms. M. on November 18, 1997, and a summary of the specimens collected from her. Without objection, Davidson read from her notes of her interview:

[Ms. M.] left her aunt's house, and she tried to flag down a cab. She said one cab did stop, but a stranger came up from behind, and grabbed her by her jacket, and said "come go down the street." The cab driver drove off. She questioned the stranger, "do I know you?" Then she, "felt his gun in my back." He took her behind this wall, behind an old folk's home. He told her to give him her money. He pushed her to the ground, and pointed a gun at her head. He didn't—she didn't give him the money, so he dug into her pockets and took it.

---

**6.** Davidson stated that "SAFE" refers to Sexual Assault Forensic Examiner.

He told her to take her clothes off. She states, "I was taking too long, so he pulled my pants down, and took them off." She was crying and yelling, "help." She states two people walked by and saw, but they ran off. He told her to get on her knees, and "suck my dick." He shoved her head down, and made her do it. He ejaculated in her mouth. She spit it out. He told her to lay on the ground, the gun was pointed at her face. He then penetrated her vagina.

He tried to get her to kiss him, but she turned her head, like she was coughing. He told her—he hit her in the face. He did ejaculate. He kept asking her if she liked it. She was crying and yelling, no one came.

When he was finished, he made her kneel down and "give him head." He kept smacking the back of her head and telling her to go faster. He ejaculated again. He then made her lay on her back, and he penetrated her vagina again. He said, "bitch, don't you want it." He again made her give him head.

He then got up and peed on [her] coat and face and shirt. He then pulled her up and pushed her against the tree. He asked her if she had anymore money or valuables he would want. She said no. He used the gun like he was going to hit her, and then clicked it back, and had his finger on the trigger and pointed it at her head. He then put it in her mouth, he took it out, and made her lay on the ground on her stomach.

He picked up her bag, pointed the gun at her head, told her to look down and stuffed dirt in her mouth. He kept saying some more, some more. He walked off saying, if he heard her moving while he was walking away, he would shoot her. She peeked once, and he was still there.

The second time, he was gone, and then she put her shoes on and ran. She saw him heading towards the projects. She ran to her boyfriend's house. The clothes he took from her, she was taking these clothes to her mother's house. It was a royal blue Mountain . . . a white, some kind of jacket, a sky blue New York Yankees jersey, $35, black hooded

sweatshirt and pants and some deodorant, bra and underwear.

Davidson acknowledged that Ms. M. did not tell her about being hit with a handgun. She tested Ms. M.'s alcohol level and "it was less than 20," but agreed that that does not necessarily mean it was that low at 11:00 pm on November 17, 1997.

Ms. M. testified that she is a special education assistant. At the time of trial, she resided in California. At the time of the attack, however, she was a college student in Baltimore and worked as a waitress. In November 1997, she lived with her aunt at 911 North Washington Street.

With respect to the events in issue, Ms. M. recalled that she had agreed to meet her boyfriend, Reginald Webb, at his house, located at 1306 Monument Street, less than a mile from her aunt's house. As to the night in question, she recalled:

I stepped outside my aunt's house, and I flagged down a cab, but the cab didn't stop, it kept going. So I walked down a little further, down the street, I'm not sure exactly what street it was on. But I saw another cab, and I tried to get it to stop, but it didn't. And I just decided to walk the rest of the way.

And I walked all the way up to ... it was in between a church and a KFC, it was in a shopping center. And as I crossed the street, I saw cars going by, and one of the cars stopped and let a guy out, but it kept going. And he said, hey, stop, let me talk to you for a minute, and I said, no. And I kept walking.

And before I could cross the street, he caught up to me, and he had a gun in my back. And he asked me to go with him up the hill behind the wall,[7] and I said, no. And he said, you're going to go with me, because you're my girlfriend.

\* \* \*

---

7. Ms. M. stated that the wall was "at the old folks home" in the 1400 block of East Madison Street.

He then directed me to go behind the wall, that was at the old folks home, and he told me to take my clothes off. And I said, no. And that's when he took my clothes off.

According to Ms. M., "there wasn't much light ...", although a nearby light post emitted some light. The assailant removed her pants, sweat pants, and underwear. Ms. M. continued: "Then he told me to lay down, and I wouldn't. And then he pulled me down, and that's when he began to—that's when he raped me." Ms. M. indicated that the rapist did not use a condom. Further, she stated:

He put his penis in my vagina, and kept going, even though I told him no, and I told him to stop. He wouldn't stop. And I asked him to let me go, and he said no, that I was his girlfriend, and he just kept saying it over and over again.

And then he told me to turn over, and I said no. And he turned me over, and he pushed my face down in the dirt. And he then put his penis into my vagina again. He ejaculated, and then he sat me up, and made me perform oral sex on him.

He placed his penis in my mouth, and asked me—he asked me to keep sucking harder, and I was like, no, I didn't want to. So he grabbed the back of my head and forced me to do it. And he ejaculated in my mouth.

Then he urinated on my head and all over my face, and shoved dirt in my mouth, and turned me back over on my stomach, and put his penis in my vagina again. Then he stopped, and he hit me on my head with the gun, because I asked him, why don't you just kill me, if you want to kill me, just kill me. And he didn't.

He had the gun pointed at my face, ... [i]t didn't go off for some reason.[8]

\* \* \*

---

8. Ms. M. described the gun as black, and believed it was an automatic. Although she was "not certain if it was real or a toy gun," she noted that it was heavy, based on how it felt when the assailant hit her with it.

He then again repeatedly raped me, and I saw two strangers walk across the old folks home, and I asked them to help, because he was raping me. And they just looked at me, like I was crazy. And he told them to go away that he was my boyfriend and I liked it. And I said no, he's not, and he hit me with his hand, and they [sic] ran off.

\* \* \*

I kept telling him to stop, and by that time, I heard a police car. I don't know if he heard it, too, but that's when he stopped and he ran off. And I got up, and I wiped my face with my hands, because I could barely see. There was urine in my face.

Ms. M. recalled that she had been "carrying some presents and a bag and a backpack," and the assailant took her money. After the assault, Ms. M. ran to her boyfriend's house, wearing "just a shirt and a bra." Her pants were "at the scene," along with her "underwear." She recalled: "[B]efore I could knock on the door, he opened the door, and I fell to my knees. And I think that's when I told him what happened, and I told him to call the police." Ms. M. went to Mercy Hospital, where she was examined by a nurse who "took swabs...."

Ms. M. identified appellant in court as the person who raped her. She maintained that she did not know her assailant. Ms. M. also identified the clothing she wore at the time of the attack, which was admitted in evidence, as well as a pair of gloves worn by her attacker.[9]

On cross-examination, the following exchange ensued:

[APPELLANT'S COUNSEL]: ... And isn't it true that when you spoke to Detective Peters ... in August 2007, you noted that the person was 20, 22 years of age, five foot four, five foot eight, moustache, smelled of alcohol. Do you remember telling him that?

\* \* \*

---

9. It is not clear whether the gloves were admitted in evidence.

[Ms. M.]: Yes, I do.

\* \* \*

[APPELLANT'S COUNSEL]: Ms. [M.], on November the 18th, 1997, did you tell a police officer that the person who raped you was a black male, approximately 19 years of age, five foot seven, 150 pounds, moustache, black hair, black blue jacket, bluejeans, white sneakers, light skin, had been drinking? Did you tell a police officer that?

[Ms. M.]: I do not giving [sic] the description, but I do remember saying that he had alcohol on his breath.

Appellant's counsel referred Ms. M. to State's Exhibit 1, a photo array she was shown on August 3, 2007. Ms. M. agreed that she initially pointed to the individual in photo number five as the person who attacked her, and that person was not appellant. The detective instructed her to sign photograph number five to signify that the individual in that photograph raped her. When asked whether "she pick[ed] out any other photographs in the photo array," Ms. M. responded: "Yes, but I was unable to sign it, because [the detective] said I had to sign the one that I chose first." Although Ms. M. claimed that she immediately "let the detective [10] know that it was the wrong person," Ms. M. acknowledged that the "Remarks" section on the back of the photo array did not indicate that she told the detective she selected the wrong person. She also said that she was shown another photo array, but she did not make any identifications in that photo array.

Defense counsel asked Ms. M.: "[I]sn't it true, Ms. [M.] that you do know [appellant], and not as a rapist . . . ?" Ms. M. responded: "No, it is not." She also disputed that she was ever at the home of appellant's aunt or that she had been involved in a dispute with appellant's mother.

On re-direct, the following occurred:

---

10. Ms. M. was not able to recall the detective's name, but indicated that it was a male. Detective Norton's testimony suggests Ms. M. was referring to Detective Peters.

[THE PROSECUTOR:] When you looked at this photo array, when you turned it over and looked at it, what did you do?

[Ms. M.]: I looked over it a couple of minutes, and I wasn't certain, because it was 11 years ago. It was hard to identify the person at first. But once I signed, I realized I signed the wrong one, and I let the detective know as soon as possible, that's not him.

[THE PROSECUTOR]: Okay. So had you already signed your name?

[MS. M.]: Yes.

[THE PROSECUTOR]: So you had signed your name, and then you said, wait a minute, that's not the person.

[MS. M.]: Yes.

[THE PROSECUTOR]: Okay. Who is the person on that photo array that did rape you that evening?

[MS. M.]: The first picture.[11]

At the close of the State's case, appellant's counsel moved for judgment of acquittal on all counts. The court denied the motion.

Appellant was the sole witness for the defense. As noted, he was fifteen years of age in November 1997. Dansbury testified that he knew Ms. M. as a "girl that I had known or I met previously, you know, in the area of Monument Street and that I had some type of relationship with her at one time." Moreover, he claimed that he had sex with Ms. M. only once, and that it was consensual.

Appellant recalled that in 1997, he and a friend were walking on Monument Street and he "notice[d] there's girls coming down the street.... [Ms. M.] said 'what's up' to me or hello or whatever and then it went from there." Because his mother, Cynthia Ray, did not have a phone at the time, he gave Ms. M. the phone number for his aunt, Tanya Ray, who

---

11. We did not locate any testimony identifying the person depicted in the "first picture."

lived next door. According to appellant, Ms. M. called him at his aunt's house and they spoke to each other "[o]n more than one occasion." Then, one day in November, not "too far from Thanksgiving," appellant had a few people over at his aunt's house, and Ms. M. stopped by. They started talking about school, and she told him that she was in college. When appellant's aunt came home from work, a little after 11:00 p.m., she "started fussing or whatever about people being in the house," so he and Ms. M. went to appellant's house. While he and Ms. M. were talking, "the issue of I guess, you know, sex or whatever came up or whatever, and we started kissing. And one thing led to another and we ended up in my bedroom." However, appellant's younger brother was in the bedroom, so appellant told him to leave.

According to appellant, he and Ms. M. then engaged in sexual intercourse. However, appellant's mother walked in and found them. His mother "asked [Ms. M.] something about her being out in somebody's house at that time of night having sex. . . ." Appellant could not "remember exactly what [Ms. M.'s] response was to [his] mother," but he related that his "mother took it as disrespect." According to appellant, his mother and Ms. M. got into "a tussle." His aunt heard the commotion and intervened, grabbing appellant's mother and "breaking it up." According to appellant, Ms. M. was "hollering and screaming," and walked toward the street corner, about five or six houses from his mother's house. Appellant claimed that he never saw Ms. M. again until the trial. And, he denied that he "ever attacked [Ms. M.] at any time."

On cross-examination, appellant indicated that when he had sex with Ms. M., he did not wear a condom and he ejaculated. Appellant claimed that his friend, Gerrell Green, was with him when he met Ms. M. for the first time.[12] Appellant also identified the other people who were present at his mother's house when Ms. M. was there: his sister, Diera, who was nine years old at the time; his brother Kevin, who was around ten

---

12. The name is spelled "Jarel" in the transcript but "Gerrell" in appellant's brief. We shall use the latter spelling.

years old at the time; and his sister Denae, who was a baby at the time. Appellant also claimed that his cousin, Phillip, who was about twelve years old at the time, was at his aunt's house, along with his cousin, Darnell, who was around eighteen or nineteen years old at the time; his cousin, Sedrick, who was a baby at the time; his cousin, Devonte, who was about four years old at the time; his friend, Deandre, who was about seventeen or eighteen years old at the time; his friend, Gerrell, and Gerrell's brother, Antwon, who was about seventeen or eighteen years old at the time.

At the close of appellant's case, defense counsel again moved for judgment of acquittal. The court denied the motion. The jury returned its verdict on June 12, 2008.

We shall include additional facts in our discussion.

## DISCUSSION

### I.

In his instructions to the jury at the end of the case, the trial judge, *sua sponte,* gave the following "missing witness" instruction:

> Now, you have heard testimony about the defendant's mother and a number of his relatives and friends ... [w]ho are not called as witnesses in the case. Now, if a witness could've given important testimony on the issue in this case, and if that witness was peculiar [sic] within the power of the State or defense to produce, but was not called as a witness by the State or defense, and the absence of that witness was not sufficiently explained, then you may decide that the testimony of that witness would've been unfavorable to the State or defense.

Appellant's trial counsel objected three times to the missing witness instruction. The first objection was lodged before the instruction was propounded, when the trial judge told the parties he intended to give the instruction to the jury. The following colloquy is pertinent:

THE COURT: All right. You asked a lot of questions about a lot of people who may have been present. Are you asking the Court to give [Maryland Criminal Pattern Jury Instruction ("MPJI–Cr") 3:29]?

[THE PROSECUTOR]: May I look at it again, Your Honor? I didn't bring it with me.

[APPELLANT'S COUNSEL]: I hope that's not missing witness, Your Honor. Not—

THE COURT: It certainly is.

[APPELLANT'S COUNSEL]: That's ten years ago and there's no—you know, they're not available to us. There's no evidence that they're available to us. That's just—you know, come on now.

[THE PROSECUTOR]: Actually, two of them are in the hallway, so there is evidence they're available.

[APPELLANT'S COUNSEL]: Well they're available to the State, they were in the voir dire, you know, so they could be called.[13]

THE COURT: The question is, do you want it?

[THE PROSECUTOR]: Yes, Your Honor.

[APPELLANT'S COUNSEL]: I will—

THE COURT: I'm going to give it.

[APPELLANT'S COUNSEL]: I will accept [sic] to it, Your Honor, and I'll argue it.

THE COURT: We're talking about family members, cousins, brothers, mother, and aunt. There's no way in the world you can say that they're not available.

[APPELLANT'S COUNSEL]: Your Honor, that was ten years ago. You're talking about something that's one year. That's—you're talking about that you're assuming that people's memories will stay strong for ten years. You assume people remember it. That is a—I don't think that's a fair and valid assumption.

---

**13.** Gerrell Green, Cynthia Ray, and Tanya Ray were among the names of potential witnesses included in the voir dire.

THE COURT: All right.

[APPELLANT'S COUNSEL]: This is ten years ago. This is not 2006. That was ten years ago.

THE COURT: All right.

[APPELLANT'S COUNSEL]: To say, you know, we haven't even gone into whether all these people are alive. That question wasn't asked.

THE COURT: Well listen, the rule—

[APPELLANT'S COUNSEL]: Are these people still in state?

\* \* \*

[APPELLANT'S COUNSEL]: I would accept [sic] it, Your Honor.

THE COURT: All right, the exception is noted for the record.

Defense counsel also objected during the jury instructions. The following exchange is noteworthy:

THE COURT: Now, you have heard testimony about the defendant's mother and a number of his relatives and friends—

[APPELLANT'S COUNSEL]: May we approach the bench, Your Honor?

THE COURT: Yes, you may.

(Bench conference as follows:)

[APPELLANT'S COUNSEL]: That is not the standard instruction. If you wish to talk about that, I would say, with all due respect, you would have to talk about the victim's aunt who was mentioned, Mr. Webb's mother who was mentioned.

THE COURT: No, I don't have to do that. I've already told you I'm going to give this.

[APPELLANT'S COUNSEL]: But the missing instruction would apply to State's witnesses, too. How can it just apply to defense witnesses? The [victim's] aunt was mentioned as the person Mr. Webb called.

THE COURT: ... Anything else?

[APPELLANT'S COUNSEL]: Also, his mother was mentioned as being at the house.

THE COURT: Anything else?

[APPELLANT'S COUNSEL]: Detective Peters obviously has been mentioned in this case.

THE COURT: No, I'm not going to talk about Detective Peters.

[APPELLANT'S COUNSEL]: Well, I think it's highly improper for you to mention people, to pick out people from the defense. If the State wants to argue that, that's perfectly proper.

THE COURT: Are you finished?

[APPELLANT'S COUNSEL]: But it's completely improper for you to do that.

The court proceeded to give the missing witness jury instruction, as noted earlier. Appellant's counsel renewed his objection at the end of jury instructions. The following colloquy is relevant:

[APPELLANT'S COUNSEL]: Your Honor, I would just like—I have two, but first, I would like to expand with regard to my missing—my exception to the missing witness instruction.

THE COURT: You don't need to explain.

[APPELLANT'S COUNSEL]: No, I do need to put this on the record.

THE COURT: All right. Go ahead and explain.

[APPELLANT'S COUNSEL]: This is a situation where the defendant was charged, accused, and notified of this charge in 2007, ten years after the event. So I do except to the missing witness instruction.

THE COURT: I understand.

During closing argument, the prosecutor argued:

So he just tells us that, yeah, this girl randomly like 11 years ago is at my house and we were playing video games, and over 11 or 12 of my family members saw her.

But where was Mr. Green? Mr. Green saw this victim or the female at the house, but allegedly this victim, not one time, but two times. So where is Mr. Green? Where is his aunt? Where is his mother?

They got in a fight with her. There was actually a fight with this female at the house. So where are they to tell us what happened? Where is Deandre, Antoine, Phillip, Darnel, Cedric, Delante, Diarra? [14]

Where's Kevin? Kevin got kicked out of his own bedroom, because there was [a] female coming in. Where's Kevin?

And I'm not even counting the two obviously that were infants at the time, because it would be ridiculous for them to—to expect them to know. But where are these 11 other witnesses?

And I'll draw to your attention that you did hear about Cynthia Ray and Tonya [15] Ray, because they were on the witness list. So where are they today?

On appeal, appellant argues that "[t]he trial judge's missing witness instruction, made without a request from either the prosecution or the defense, did not meet the legal requirements for giving such an instruction, and unnecessarily and substantially prejudiced the Appellant." Noting the gap of more than a decade between the incident and the trial, he points out that the "judge conducted no inquiry" as to whether any of the "witnesses who conceivably could have testified" were, in fact, available or "peculiarly available" to him. Moreover, he contends that "the trial judge's decision to mention particular defense witnesses while not referring to any missing State witnesses placed him in a position to unfairly and unjustifiably assist the prosecution at the expense of Appellant."

---

**14.** Elsewhere in the transcript, "Antoine" was spelled "Antwon"; Darnel was spelled "Darnell"; Cedric was spelled "Sedrick"; Delante was spelled "Devonte"; and Diarra was spelled "Diera."

**15.** In appellant's motion for a new trial, he spelled his aunt's name as "Tanya."

In appellant's view, "[t]he circumstances in this case fall far short of meeting the elemental requirement that a witness be 'peculiarly available' to a party prior to a judge giving a missing witness instruction." In this regard, he observes that his aunt and mother "were right outside the courtroom during the trial," and were equally available to the State. Moreover, he argues that the fact that some of the missing witnesses were his "relatives does not render their testimony pragmatically unavailable to the State since relatives are not per se considered to be peculiarly available to one side; what matters is the context of the situation in which they were not called to testify." Appellant also claims that "another potential witness who was listed in the voir dire, Gerrell Green, was incarcerated at the time of trial and therefore unavailable" to appellant.

Further, Dansbury posits:

As a practical matter, there are myriad reasons why the defense counsel may have chosen not to put particular witnesses on the stand, none of which would justify an inference being drawn that a witness would have testified that the Appellant's version of the story was factually mistaken, or worse, fabricated. Since the incident in question occurred over ten years ago, witnesses' memories may have faded, and defense counsel understandably could have been reluctant to have someone testify whose memory may have been questioned by the State during cross-examination. Moreover, defense counsel might have made an assessment that even if someone recalled Appellant in the company of Ms. [M.], that witness's demeanor or prior history would not have made a favorable impression. The defense counsel must have discretion in determining trial strategy. Thus, for the trial judge to insert himself in this case by essentially making the missing witness argument for the prosecution is to shift effectively the burden of proof to the Appellant.

In addition, in assessing the effect of the instruction, appellant points to the central importance of credibility to this case. Conceding that he engaged in sexual intercourse with Ms. M., Dansbury maintains that "[t]he only issue at trial was whether

this was consensual," and claims that his "credibility was the dispositive issue in the case." Because "the critical determination for the jury was who to believe—Ms. [M.] or Mr. Dansbury," coupled with "the weight that the jury would have likely given to the judge's guidance in assessing whether to credit [his] testimony," appellant insists that the error was not harmless.

The State counters that "the trial court properly instructed the jury on missing witnesses. . . ." In its view, "[t]he court properly noted that the defense missing witnesses appeared to be 'peculiarly available' to the defense based on the fact that these witnesses were either relatives or close family friends." Further, it notes that "the court rejected Dansbury's argument that the testimony would not be material. Indeed, these witnesses, according to Dansbury, could corroborate his account of a relationship and consensual sex." Alternatively, the State claims that any error was harmless beyond a reasonable doubt, because "the evidence of Dansbury's guilt was overwhelming."

■ A "missing witness" instruction informs the jury that the failure of a party to call a material witness permits the jury to infer that the testimony would have been unfavorable to the party who failed to call such a witness. *Robinson v. State*, 315 Md. 309, 314–15, 554 A.2d 395 (1989); *Christensen v. State*, 274 Md. 133, 134–35, 333 A.2d 45 (1975); *Smith v. State*, 66 Md.App. 603, 620, 505 A.2d 564, *cert. denied*, 306 Md. 371, 509 A.2d 134 (1986). *See* MPJI–Cr 3:29. In *Wilson v. State*, 148 Md.App. 601, 654 n. 22, 814 A.2d 1 (2002), *cert. denied*, 374 Md. 84, 821 A.2d 371 (2003), we said:

"The 'missing witness rule,' 'even in criminal cases is that if a party has it peculiarly within his [or her] power to produce witnesses whose testimony would eludicate [sic] the transaction, the fact that he does not do it creates the presumption that the testimony, if produced, would be unfavorable.' *Graves v. United States*, 150 U.S. 118, 121, 14

S.Ct. 40, 37 L.Ed. 1021 [ (1893) ] [16]

. . .

Thus, the missing witness rule applies where (1) there is a witness, (2) who is peculiarly available to one side and not the other, (3) whose testimony is important and non-cumulative and will elucidate the transaction, and (4) who is not called to testify. The inference to be drawn from the failure to call a witness will arise only if the relationship between the defendant and the witness is one of interest or affection." [Citation omitted.]

■ Notably, an adverse inference cannot be drawn " 'when the witness is not available, or where his testimony is unimportant or cumulative, or where he is equally available to both sides.' " *Robinson*, 315 Md. at 321, 554 A.2d 395 (citation omitted). *See also* 2 *McCormick on Evidence*, § 264 at 220 (6th ed. 2006) ("When it would be natural under the circumstances for a party to call a particular witness . . . and the party fails to do so, tradition has allowed the adversary to use this failure as the basis for invoking an adverse inference."). This Court has said: "Whether, in given circumstances, an unfavorable inference may be drawn from missing evidence or witnesses is a matter of fact, not law. . . ." *Keyes v. Lerman*, 191 Md.App. 533, 546, 992 A.2d 519 (2010).

Before deciding whether to propound a missing witness instruction, there is a "preferred procedure" that the trial court should follow. *Christensen*, 274 Md. at 135, 333 A.2d 45. In *Christensen*, the Court explained, *id.* at 135–36 n. 1, 333 A.2d 45 (citation omitted; emphasis added):

"The better practice . . . is for the party seeking to obtain a charge encompassing such an inference to advise the trial judge and counsel out of the presence of the jury, at the

---

**16.** In *Robinson*, 315 Md. at 318 n. 5, 554 A.2d 395, the Court observed that the terms "presumption" and "inference" are sometimes used interchangeably in regard to "the missing witness rule," but that the proper term is "inference." The Court also said, *id.* at 318, 554 A.2d 395: "There is nothing mysterious about the use of inferences in the fact-finding process."

close of his opponent's case, of his intent to so request and demonstrating the names or classes of available persons not called and the reasons for the conclusion that they have superior knowledge of the facts. *This would accord the party accused of nonproduction the opportunity of either calling the designated witness or demonstrating to the court by argument or proof the reason for the failure to call.* Depending upon the particular circumstances thus disclosed, the trial court may determine that the failure to call the witness raises no inference, or an unfavorable one, and hence whether any reference in the summation or a charge is warranted."

■■■■ The trial judge has discretion to grant or deny the instruction "when the facts would support the inference." *Robinson,* 315 Md. at 319 n. 7, 554 A.2d 395. Conversely, there is "no discretion to grant the instruction where the facts do not support the inference." *Id. See Patterson v. State,* 356 Md. 677, 688, 741 A.2d 1119 (1999) ("[A] missing evidence instruction generally need not be given; the failure to give such an instruction is neither error nor an abuse of discretion."). As this Court recently said, "the court is under no obligation to give an instruction on the matter. It may do so, and in certain circumstances perhaps it should do so, but … failure to do so is not error or an abuse of discretion." *Keyes,* 191 Md.App. at 546, 992 A.2d 519.

In *Robinson,* 315 Md. 309, 554 A.2d 395, the defendant was charged with automobile theft. He did not call as a witness a person whose identity was known only to him, and who allegedly would have exonerated the defendant. *Id.* at 311, 554 A.2d 395. On appeal, the defendant argued that the trial court erred in propounding a missing witness instruction, because it was likely that the witness would have invoked his privilege against self-incrimination. *Id.* at 312, 554 A.2d 395. The Court recognized that a "privileged witness" need not "always be called in order to avoid the unfavorable inference." *Id.* at 316, 554 A.2d 395. But, the Court reasoned that because there was no evidence of the witness's existence or involvement in the crime, other than from the defendant, the

trial court did not err in regard to the instruction. *Id.* at 317, 554 A.2d 395. Based on the circumstances, the jury could infer that the defendant did not call the witness because his testimony would have been unfavorable.

In reaching its conclusion, the Court said, *id.* at 318, 554 A.2d 395:

> Even had there been no instruction concerning the availability of this inference, we think it likely that among the first questions posed in the deliberation of this case would have been, "Why didn't the defendant produce Alvin Johnson?" Only if, as a matter of law, the unfavorable inference could not have been drawn by the jurors would the trial judge have been authorized to prohibit the prosecutor from posing that same question in argument. And, only if the circumstances were such that the trial judge should have prohibited the argument would we be likely to reverse because the instruction was given. If the argument fairly may be made, then it stands to reason that a sufficient foundation of facts exists upon which the inference [ ] may be drawn.[ ]

 Even if the court does not propound a missing witness instruction, a party may be permitted, in closing argument, to argue the adverse inference to the jury. *Davis v. State,* 333 Md. 27, 52, 633 A.2d 867 (1993). *See Garrison v. State,* 88 Md.App. 475, 483, 594 A.2d 1264 (1991), *cert. denied,* 325 Md. 249, 600 A.2d 418 (1992). Generally, in a close case, a judge may opt to deny the instruction, in favor of closing argument, because "a statement or instruction by the trial judge carries with it the imprimatur of a judge learned in the law, and therefore usually has more force and effect than if merely presented by counsel." *Hardison v. State,* 226 Md. 53, 62, 172 A.2d 407 (1961). The Court of Appeals stated in *Lowry v. State,* 363 Md. 357, 375, 768 A.2d 688 (2001) (quoting *Davis,* 333 Md. at 52, 633 A.2d 867):

> "Where a party raises the missing witness rule during closing argument, its use is just that—an argument.... Furthermore, the opposing side also has an opportunity to

refute the argument and counter with reasons why the inference is inappropriate.

In contrast to the argument context is the trial judge's instruction to the jury. In the latter case, the inference is communicated to the jury as part of the judge's binding jury instructions, creating the danger that the jury may give the inference undue weight.... A trial judge has discretion to deny a missing witness instruction, leaving the matter to closing arguments, even when the facts would support the inference."

In this case, we do not consider the failure to give a missing witness instruction. Rather, we consider the court's decision to propound such an instruction. *Bereano v. State Ethics Comm'n*, 403 Md. 716, 944 A.2d 538 (2008), is instructive in assessing the propriety of the instruction.

Bereano, an "experienced lobbyist," agreed to provide consulting and lobbying services to Mercer Venture, Inc. ("Mercer"), based on a contingency fee. *Id.* at 723–24, 944 A.2d 538. The agreement's terms were included in "a letter from Bereano to Mike Traina of Mercer," which Traina signed. *Id.* at 724, 944 A.2d 538. The State Ethics Commission subsequently "initiated a complaint" against Bereano for violation of Maryland Code (1984, 2004 Repl.Vol.), § 15–713(1) of the State Government Article, which prohibits a "regulated lobbyist" from entering into contingency fee arrangements for lobbying agreements. *Id.* at 727, 730, 944 A.2d 538. At the merits hearing, Bereano did not call Traina as a witness. *Id.* at 738–39, 944 A.2d 538. In the Commission's Final Decision and Order, it stated, *id.* at 739, 944 A.2d 538:

"At the hearing Respondent testified that the language in the fee agreement related to '1% of the first year receivables' was added to the agreement at Mr. Traina's request and that Mr. Traina had sent him the language.... Mr. Traina was on the Respondent's witness list submitted to the Commission as part of the pre-hearing requirement pursuant to our regulations.... Because Mr. Traina did not appear and testify, we make the inference pursuant to the

'missing witness rule' that his testimony would not have supported Respondent's testimony particularly in view of Respondent's incongruous testimony."

On appeal, Bereano argued that the Commission should not have "infer[red] that his failure to call Traina as a witness indicate[d] that Traina's testimony would [have been] unfavorable." *Id.* at 738, 944 A.2d 538. The Court agreed and reversed. *Id.* at 756, 944 A.2d 538. It reiterated, *id.* at 742, 944 A.2d 538:

> Before a missing witness inference may be drawn, it must be demonstrated that "the missing witness was peculiarly within the adversary's power to produce by showing either that the witness is physically available only to the opponent or that the witness has the type of relationship with the opposing party that pragmatically renders his testimony unavailable to the opposing party." *Chi. Coll. of Osteopathic Med. v. George A. Fuller Co.,* 719 F.2d 1335, 1353 (7th Cir.1983).

The Court observed that there was "no contention ... that Traina was not physically available to both parties. Therefore, the issue turns on whether Traina was demonstrated to have the type of relationship with Bereano that would render Traina unavailable to the Commission's staff counsel as a practical matter." *Id.* The Court concluded that the Commission (in the role of fact-finder) made no finding that "the relationship between Bereano and Traina created a bias on the part of Traina in favor of Bereano." *Id.* at 743, 944 A.2d 538.

Of import here, the *Bereano* Court said, *id.* at 744, 944 A.2d 538:

> "What is meant by 'equal availability' in this context is not merely that a witness is subject to compulsory process, and thus available in a descriptive sense, but that he is of equal avail to both parties in the sense that he is not presumptively interested in the outcome." *Tyler v. White,* 811 F.2d 1204, 1207 (8th Cir.1987). This is a difficult showing to make. *See Hayes v. State,* 57 Md.App. 489, 499, 470 A.2d 1301, 1306 (1984) (noting the "stringent requirement that

the witness be peculiarly within the control of the party"). The mere possibility that a witness personally may favor one side over the other does not make that witness peculiarly unavailable to the other side. *See Woodland v. State,* 62 Md.App. 503, 510, 490 A.2d 286, 290 (1985) ("The inference to be drawn from the failure to call a witness will arise only if the relationship between the defendant and the witness is one of interest or affection."); *United States v. Knox,* 68 F.3d 990, 1001 (7th Cir.1995) (holding that the potential for bias is not enough to make a witness practically unavailable and noting that "[e]ven government informants are not peculiarly within the government's control if the defendant can subpoena them as witnesses").

There is no suggestion in this record, much less a finding by the Commission, that Traina was "presumptively interested in the outcome."

In reaching its conclusion to reverse, the *Bereano* Court distinguished *Robinson, supra,* 315 Md. 309, 554 A.2d 395, in which the Court of Appeals concluded that the trial judge did not abuse his discretion in giving the instruction. The *Bereano* Court pointed to several distinctions between *Bereano* and *Robinson,* 403 Md. at 749, 944 A.2d 538:

First, unlike in the present case, the defendant in *Robinson* was given an opportunity to argue or explain the absence of the witness in an effort to forestall the announced intent to rely on the missing witness rule. *Id.* The defendant argued that he lived in a neighborhood where one was subject to bodily harm for identifying a criminal perpetrator. *Id.* Moreover, he claimed that Alvin had moved since the defendant had been in contact with him last. *Robinson,* 315 Md. at 320, 554 A.2d at 400. In the present case, there was no meaningful discussion of Traina's absence until the missing witness inference was invoked in the Commission's written decision. Unlike in the present case, Alvin was not physically available to both parties in *Robinson.* Until he was on the witness stand and the trial judge signed an order charging him with contempt, the defendant in *Robinson* refused even to give Alvin's last name. *Robinson,* 315 Md.

at 314, 554 A.2d at 397. The prosecution had no opportunity to confirm the existence of Alvin, much less the opportunity to interview him. In the present case, Traina voluntarily submitted documents and met with staff counsel.

■ Based on the record in the case *sub judice*, as well as the cases discussed above, we agree with appellant that the court abused its discretion when propounded a missing witness instruction. We explain.

■ First, there was no finding by the trial court that the persons who allegedly witnessed appellant and Ms. M. together at the homes of appellant's aunt and mother were "peculiarly available" to appellant. As appellant points out, his aunt and his mother were both outside the courtroom during the trial, and therefore the State could have called them just as readily as appellant. And, of import here, despite the fact that the persons in issue are relatives or friends of a party, "[t]he mere possibility that a witness personally may favor one side over the other does not make that witness peculiarly unavailable to the other side." *Bereano*, 403 Md. at 744, 944 A.2d 538; *see Hayes v. State*, 57 Md.App. 489, 501, 470 A.2d 1301 (1984) (concluding that the witness who was a brother-in-law of the defendant was not "peculiarly available" to the defendant because "[a] witness will not necessarily testify favorably on behalf of his sister's husband"); *Bing Fa Yuen v. State*, 43 Md.App. 109, 111–12, 403 A.2d 819 (1979) (finding witness equally available despite the fact that witness refused to speak with defense counsel and was, at the time of trial, in a federal witness protection program); *see also Harkins v. Perini*, 419 F.2d 468, 471 (6th Cir.1969) (holding that no unfavorable inference should have been permitted against the government where the government offered to submit a police officer for cross-examination at a hearing and the opposing party's attorney declined); *Jenkins v. Bierschenk*, 333 F.2d 421, 425 (8th Cir.1964) (holding that the defendant's son was equally available to both parties in the litigation) *Repecki v. Home Depot USA*, 942 F.Supp. 126, 129 (E.D.N.Y.1996) (finding that a companion of the plaintiff was equally available to

both parties); *D.S. Magazines, Inc. v. Warner Publisher Servs. Inc.*, 640 F.Supp. 1194, 1201 (S.D.N.Y.1986) (holding that the absence of a witness who could have been called by either party in a contract interpretation case did not justify the drawing of an adverse inference); *see also In re Williams*, 190 B.R. 728, 734 (D.R.I.1996) ("The existence of an attorney-client relationship alone does not imply that the attorneys were clearly favorably disposed to the positions of their past or present clients.") (citations omitted); *Williams v. Morgan*, 180 So.2d 11, 14–15 (La.Ct.App.1965) (holding that the plaintiff's broker was equally available to both parties); *State of Missouri v. Neil*, 869 S.W.2d 734, 740 (1994) (concluding that the trial court did not abuse its discretion in permitting the state to argue an adverse inference in regard to the defendant's failure to call his mother with respect to his alibi defense; based on her relationship to the defendant, she was not equally available to the state).

Second, even if, *arguendo*, appellant's mother is regarded as "peculiarly available" to appellant, based solely on her status as appellant's mother, the sweep of the jury instruction was far broader than just appellant's mother. In addition to appellant's mother, the court included "a number of [appellant's] relatives and friends...." As to the relatives and friends, the status of their relationships, without more, did not reveal that they were peculiarly available to appellant.

Third, the court's missing witness instruction, which was not initially requested by the State, was not balanced or even handed. The court singled out that appellant did not call his mother and other relatives and friends. Yet, Mr. Webb, the victim's boyfriend and a key witness, had testified that, on the night in question, he called the victim's aunt in an effort to locate the victim. The court never pointed to the State's failure to call the victim's aunt.

■ Fourth, it was not clear that any of the witnesses necessarily remembered any facts of relevance with respect to events that took place a decade before the trial. We also note that the encounter between the witnesses and Ms. M. was

brief, according to appellant, and some of the witnesses were children at the time. It is entirely plausible that memories had faded about an alleged visit in 1997 by Ms. M., yet the court made neither an inquiry nor a finding in this regard. As the Court said in *Christensen*, 274 Md. at 135 n. 1, 333 A.2d 45, the "better practice" would have been for the court to afford appellant, "the party accused of nonproduction," with the opportunity of "demonstrating to the court by argument or proof the reason for the failure to call." Appellant argued the point, but no further inquiry was made by the court. *See Thomas v. Owens*, 28 Md.App. 442, 453, 346 A.2d 662 (1975) ("[W]hen it is shown why the witness was not called upon to testify and the reasons for not calling him are reasonable and proper, no inference that his testimony would be unfavorable is permitted.") (Citation and quotations omitted).

■ Having concluded that the court abused its discretion, we must consider whether the error is reversible or, instead, harmless beyond a reasonable doubt. *See Alston v. State*, 414 Md. 92, 107–08, 994 A.2d 896 (2010); *Lancaster v. State*, 410 Md. 352, 369, 978 A.2d 717 (2009); *State v. Blackwell*, 408 Md. 677, 698, 971 A.2d 296 (2009); *Dorsey v. State*, 276 Md. 638, 659, 350 A.2d 665 (1976).

Disputing the State's contention that the instruction "had no effect on the verdict under the circumstances of [this] case," because the evidence of appellant's guilt was "overwhelming," appellant argues:

[G]iven that Mr. Dansbury and Ms. [M.] were the only witnesses to testify about the interaction between them, the jury necessarily had to assess the credibility of the alleged defendant and the alleged victim in this case. . . . The fact that the jury demonstrated its concerns about the credibility of Ms. [M.'s] testimony by acquitting Mr. Dansbury on all theft, robbery, and handgun charges despite Ms. [M.] directly testifying that the Defendant stole it from her (6/10/08 T.181 ("Q: What happened to your money? A: The guy took it. He took it.")) shows that the jury had doubts about the State's version of what occurred that night. In

light of the closeness of the case, the missing witness inference undoubtedly had the potential to shape the jury's evaluation of Defendant's testimony and sway the direction of the verdict.

Appellant also contends that "the physical evidence was not conclusive for the State . . . ." He points to the following: 1) DNA evidence taken from Ms. [M.] on the night in question suggested a possible match with a second unidentified person; 2) Ms. [M.] did not identify Mr. Dansbury as the person who raped her in the photo array shown to her; 3) Mr. Dansbury testified that he knew Ms. [M.], had talked to her on the phone on several occasions, and she came to his house in November 1997 and engaged in consensual sex with him in his bedroom; 4) Ms. [M.] had a boyfriend at the time, and thus would have been reluctant to disclose that she was carrying on a relationship with Mr. Dansbury, a fifteen-year-old boy in 1997; 5) the State provided no corroboration that Ms. [M.] left from her aunt's house instead of Mr. Dansbury's house the night she was allegedly raped; and 6) the proximity of Mr. Dansbury's house to Ms. [M.'s] boyfriend's house enabled Ms. [M.] to walk the 1.5 miles between those locations on the night in question. Thus, the evidence supporting the Defendant was significant.

In *Bellamy v. State*, 403 Md. 308, 332–33, 941 A.2d 1107 (2008), the Court reiterated the scope of harmless error review:

In *Dorsey v. State*, 276 Md. 638 [350 A.2d 665] (1976), [276 Md. 638] 350 A.2d 665 (1976), we adopted the test for harmless error announced by the Supreme Court in *Chapman v. State*, 386 U.S. 18, 23 [87 S.Ct. 824, 17 L.Ed.2d 705] (1967). As adopted in *Dorsey*, the harmless error rule is:

When an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed "harmless" and a reversal is mandated. Such reviewing court must thus be

satisfied that there is no reasonable possibility that the evidence complained of—whether erroneously admitted or excluded—may have contributed to the rendition of the guilty verdict.

*Dorsey,* 276 Md. at 659, 350 A.2d at 678.

In performing a harmless error analysis, we are not to find facts or weigh evidence. Instead, "what evidence to believe, what weight to be given it, and what facts flow from that evidence are for the jury ... to determine." *Dykes v. State,* 319 Md. 206, 224, 571 A.2d 1251, 1260–61 (1990). " 'Once it has been determined that error was committed, reversal is required unless the error did not influence the verdict; the error is harmless only if it did not play any role in the jury's verdict. The reviewing court must exclude that possibility beyond a reasonable doubt.' " *Spain v. State,* 386 Md. 145, 175, 872 A.2d 25, 43 (2005) (Bell, C.J., dissenting) (quoting *Ware v. State,* 360 Md. 650, 716–17, 759 A.2d 764, 799 (2000)) (Bell, C.J., dissenting). " 'To say that an error did not contribute to the verdict is, rather, to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed by the record.' " *United States v. O'Keefe,* 128 F.3d 885, 894 (5th Cir.1997) (quoting *Yates v. Evatt,* 500 U.S. 391, 403, 111 S.Ct. 1884, 1893, 114 L.Ed.2d 432 (1991)). The "harmless error rule ... has been and should be carefully circumscribed." *Younie v. State,* 272 Md. 233, 248, 322 A.2d 211, 219 (1974).

To be sure, "[h]armless error review is the standard of review most favorable to the defendant short of an automatic reversal." *Bellamy,* 403 Md. at 333, 941 A.2d 1107. But, we are mindful that Maryland's appellate courts have upheld criminal convictions, notwithstanding error committed by the trial court, when the evidence of guilt was so "overwhelming" as to render the court's error harmless beyond a reasonable doubt. *See, e.g., Rubin v. State,* 325 Md. 552, 578, 602 A.2d 677 (1992); *Burral v. State,* 118 Md.App. 288, 298, 702 A.2d 781 (1997), *aff'd on other grounds,* 352 Md. 707, 724 A.2d 65 (1999), *cert. denied,* 528 U.S. 832, 120 S.Ct. 89, 145 L.Ed.2d 75 (1999).

*Hayes, supra,* 57 Md.App. 489, 470 A.2d 1301, provides guidance. In that case, Ted Hickman and Jay Connelly burglarized Lucia Midkiff's home. *Id.* at 491–92, 470 A.2d 1301. About a month later, Midkiff identified some of those items at an antique shop that the defendant owned. *Id.* at 492, 470 A.2d 1301. The defendant was then arrested. *Id.* At trial, Hickman testified that "the proceeds of the burglary were put in a trash can and moved to Paul Bentley's garage, from which location, Bentley was going to sell the merchandise." *Id.* According to Bentley, Hayes went to Bentley's garage and purchased the stolen items. *Id.* Bentley told the jury: " 'In respect to Mrs. Midkiff's burglary, [Hayes] said . . . as far as I'm concerned, it's yours. I don't know where it comes from. I really don't care. . . .' " *Id.*

Hayes testified in his own defense. He claimed that he was driven to Bentley's residence by Joseph Giordano, his brother-in-law, and "had no reason to believe they were stolen property." *Id.* But, Hayes did not call Giordano to the witness stand. *Id.* Over defense counsel's objection, the court gave a missing witness instruction, although the State had not requested one. *Id.* at 493–94, 470 A.2d 1301. Thereafter, the jury convicted Hayes of theft. *Id.* at 491, 470 A.2d 1301.

On appeal, this Court, through Judge Bell, found that the trial court erred in giving the missing witness instruction. *Id.* at 495, 501, 470 A.2d 1301. The Court held, in part, that Giordano was not peculiarly within the defendant's control. *Id.* at 495, 470 A.2d 1301. And, of import here, the Court rejected any claim that the court's error was harmless. *Id.* at 501, 470 A.2d 1301. It reasoned, *id.* at 501–02, 470 A.2d 1301:

> First, in this case, the main issue before the jury was who to believe—the State's witnesses, including Bentley, who claimed Hayes knew the property had been stolen, or Hayes, who testified that he had no reason to suspect that the property had been stolen, and that he believed he was engaging in a legitimate business transaction. As this Court noted in *Christensen* [*v. State,* 21 Md.App. 428, 437, 320 A.2d 276 (1974), *rev'd on other grounds,* 274 Md. 133, 333 A.2d 45 (1975) ]:

In a case determined by little more than which of two persons is to be believed possible inferences, whether naturally or legally raised, become crucial.

Since Giordano's testimony could well have reinforced the credibility of Hayes, the "highlighting" by the court of the inference that Giordano would testify unfavorably was crucial and prejudicial. Secondly, the giving of the instruction by the court in and of itself unfairly emphasizes the fact that Hayes did not call a particular witness. A reasonable person, upon hearing the instruction, would most likely give credence to it and infer that the missing witness' testimony would be unfavorable. Thirdly, since the instruction was couched in very general terms and no factual predicate was laid upon which the jury could intelligently decide whether to apply the rule, the instruction could have tended to mislead the jury. In light of the above, we cannot find that the error was harmless beyond a reasonable doubt.

In this case, Dansbury put his credibility in issue when he testified in his own behalf and offered his version of what transpired. As indicated, he claimed that he and Ms. M. first went to his aunt's house, and then engaged in consensual sex at his mother's house. He also recounted that an argument unfolded when his mother found Ms. M. in bed with appellant. The court's missing witness instruction expressly highlighted that appellant did not call his mother and other relatives and friends. Although the State's evidence of appellant's guilt was quite strong, it was not so overwhelming as to convince us, beyond a reasonable doubt, that the missing witness instruction did not influence the jury's verdict.[17] As in *Hayes*, a reasonable juror may have inferred that Dansbury decided not

---

17. For example, in addition to appellant's testimony, DNA evidence taken from Ms. M. contained a minor allele, suggesting a possible match with a second unidentified person; the State did not clearly explain the significance or insignificance of a minor allele; and Ms. M. did not initially identify Mr. Dansbury as the person who raped her in the photo array shown to her in 2007. And, as appellant notes, the jury did not accept all of Ms. M.'s testimony, as it acquitted him of the handgun and theft related charges.

to call witnesses to the events because their testimony would be unfavorable. In turn, this might have led a reasonable juror to discredit appellant's entire account.

In sum, in the context of this case, in which Mr. Dansbury and Ms. M. were the only witnesses to the contact between them, and appellant's credibility was central to his defense, we cannot say that the missing witness instruction had no effect on the jury's evaluation of appellant's credibility, on which his defense rested.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED. CASE REMANDED TO THAT COURT FOR A NEW TRIAL. COSTS TO BE PAID BY MAYOR AND CITY COUNCIL OF BALTIMORE.**