*Jerry Harris v. State of Maryland,* No. 9, September Term 2017. Opinion by McDonald, J.

**CRIMINAL PROCEDURE – MISSING WITNESS INSTRUCTION**

A legal doctrine known as the "missing witness rule" concerns an inference that might be drawn from the absence at trial of a potential witness. If the potential witness would be expected to have knowledge of information important to an issue in the case and if that witness is "peculiarly available" to one party because of a relationship of interest or affection but the witness is not called by that party to testify, the factfinder may infer that the witness would have given testimony unfavorable to that party. In argument in a jury trial, counsel may urge the jury to draw such an inference adverse to an opposing party. In a missing witness instruction, the trial court tells the jury that it may draw such an inference if it finds that the prerequisites of the missing witness rule are satisfied. However, the rationale underlying the missing witness rule is questionable and, in a criminal prosecution, the doctrine may be in conflict with constitutional principles that place the burden of proof on the prosecution and forbid comment (in a case where the defendant does not testify) on the failure of a defendant to testify. Accordingly, a missing witness instruction that invites the jury in a criminal case to draw an inference adverse to the defendant based on the defendant's failure to produce evidence should rarely, if ever, be given.

Circuit Court for Baltimore City
Case Nos.: 114069007, 114069008
            114069009, 114069010
Argued: October 11, 2017

IN THE COURT OF APPEALS

OF MARYLAND

No. 9

September Term, 2017

_____

JERRY HARRIS

v.

STATE OF MARYLAND

_____

Barbera, C.J.
Greene
Adkins
McDonald
Watts
Hotten
Getty,

JJ.

_____

Opinion by McDonald, J.
Adkins, J., concurs and dissents.

_____

Filed: April 12, 2018

In a criminal trial, the prosecutor asks the jury to draw various inferences from the evidence adverse to the defendant – the ultimate adverse inference being that the defendant is guilty as charged.  In certain limited circumstances, one such adverse inference may be that the defendant's failure to call a witness peculiarly in the control of the defendant indicates that the witness would have testified unfavorably to the defendant.  This is sometimes called the "missing witness rule."

There is a related pattern jury instruction sometimes used by trial courts in Maryland known as the missing witness instruction.  In that instruction, the trial court instructs the jury that, if a witness likely could have given important evidence in the case and it was peculiarly within the power of one party to produce that witness but the witness was not called and the individual's absence was not adequately explained, the jury may infer that the witness would have testified unfavorably to that party.

In a criminal prosecution, the State bears the burden of proof beyond a reasonable doubt on all elements of the crimes charged and a defendant has no obligation to testify, to call witnesses, or to produce evidence.  When a trial court gives a missing witness instruction at the behest of the prosecution against the defendant, the court essentially endorses the particular inference that the prosecutor asks the jury to draw against the defendant.  In our system of justice, this should rarely – if ever – be done, as it may be at odds with the constitutional principles that govern a criminal case.  Even in the limited circumstances in which a prosecutor may legitimately urge the jury to draw an inference adverse to the defendant under the missing witness rule, there is no need for the court to endorse that element of the prosecutor's argument.

In this case, Petitioner Jerry Harris was charged with various offenses arising out a home invasion and robbery at an apartment in Baltimore City. None of the victims of the crime identified Mr. Harris as a participant in the robbery; the only evidence linking him to the crime was a latent fingerprint examination that matched prints found on pill bottles at the apartment to prints on file for his left hand, which had previously been disabled in an industrial accident. Mr. Harris testified that he had been at his mother's home on the night of the robbery, but his mother did not testify. At the suggestion of the trial court, the prosecutor requested a missing witness instruction that advised the jury that it could infer from the mother's absence that she would have testified unfavorably to Mr. Harris. The trial court gave that instruction and, after a lengthy deliberation, the jury convicted Mr. Harris of some of the charges related to the robbery and acquitted him of others.

We hold that it was error to give the missing witness instruction in this case and, for that reason, reverse Mr. Harris' convictions.

# I

## Background

*The Home Invasion and Robbery*

On the evening of January 16, 2014, Gale Binko and Alease Holmes were playing cards at the kitchen table in Ms. Binko's Baltimore City apartment. Lester Allen, who also

lived in the apartment, and a woman known only as "Reds"[1] were also present. Several pill bottles for Ms. Binko's prescriptions[2] and some cash lay on the table.

Around 9:00 p.m., Reds decided to leave the apartment. At Ms. Binko's request, Mr. Allen accompanied Reds to the door. When they opened the front door, they were confronted by two masked men, one of whom had a gun. Back in the kitchen, Ms. Binko heard some unfamiliar voices interspersed with Mr. Allen's voice. She heard Reds say "[T]hey got a gun." Reds and Mr. Allen then returned to the kitchen accompanied by the two masked men. The man with the gun was holding it to Mr. Allen's head.

The second masked man, who was called "Black" by the masked man with the gun, grabbed approximately $350 from the kitchen table in front of Ms. Binko. Black then opened Ms. Binko's blouse, groped her, and pulled out a bottle of Oxycodone pills that was concealed in her blouse.

The masked man holding the gun to Mr. Allen's head then directed Black to check Ms. Binko's socks. Black removed Ms. Binko's shoes, but Ms. Binko began to fight back. At one point during the struggle, Black's mask came off, giving Ms. Binko a glimpse of his face. She described him as a tall, stout, black man with a dark complexion and a mustache. She was not sure whether he had a beard. Ms. Binko testified that Black used

---

[1] Ms. Binko, Ms. Holmes, and Mr. Allen all testified at trial. The State was unable to locate Reds and she did not testify.

[2] Ms. Binko testified that she had recently purchased the four bottles of pills at a pharmacy.

3

both of his hands when he searched her blouse, pulled off her shoes, and struggled with her.

While Ms. Binko was engaged with the two intruders, Ms. Holmes and Reds fled through a back door. After subduing Ms. Binko, Black picked up and examined each of the three pill bottles on the kitchen table. Then he and the man with the gun left the apartment through the back door.

*The Investigation*

After the robbers left, Ms. Binko called 9-1-1. The police responded to the apartment within five minutes. Ms. Holmes returned to the apartment shortly thereafter, although Reds did not. Detective Franklin Gaskins interviewed Ms. Binko, Ms. Holmes, and Mr. Allen. The police were never able to locate or identify Reds. Ms. Binko was unable to make an identification of the robbers because, she later testified, she was "upset and afraid."

Detective Gaskins summoned the crime lab to the apartment. A crime lab technician lifted two prints from a large prescription bottle and one from a small prescription bottle on the kitchen table. A latent print examiner at the Police Department lab later analyzed the lifted prints. The examiner determined that the three prints matched impressions on file of Mr. Harris' left thumb, index finger, and middle finger.[3]

---

[3] To avoid making a reference to Mr. Harris' criminal history, the State's Attorney and defense counsel agreed on a stipulation that Mr. Harris' fingerprints were in a "state database."

Detective Gaskins then took a photograph of Mr. Harris to Ms. Binko's home to display to Ms. Binko. She told the detective that she did not know Mr. Harris, that he had not been to her home, and that there was no reason for him to have handled her pill bottles. Neither Ms. Holmes nor Mr. Allen, who also testified at trial, identified Mr. Harris as one of the robbers.

Based on the fingerprint identification, Detective Gaskins obtained an arrest warrant for Mr. Harris. Following Mr. Harris' arrest in February 2014, Detective Gaskins attempted to interview him.

*Police Interview of Mr. Harris*

At trial, the prosecutor asked Detective Gaskins about his attempt to interview Mr. Harris following his arrest. The prosecutor asked the detective what occurred during that interview, defense counsel objected, and the following bench conference ensued:

| | |
|---|---|
| Court: | There's nothing wrong with the question. I don't know what the answer is going to be. Meaning, if his answer is, he said, then we could get into this. It could be, I observed him crying. And then that's fine. Do you know what I mean? So I don't know where this is going. |
| Defense Counsel: | Well, what actually occurred was that he started to sign a waiver of rights form, and then asked them if he was being charged with armed robbery. And they said yes. And he says, well, I'm not talking, you know, I want to talk to my lawyer. And he refused to sign the rest of the statement.<br><br>So I think that he has a fifth amendment privilege not to incriminate himself and that, you know, his refusal to talk to police shouldn't be admissible as proof of guilt. |

5

| | |
|---|---|
| Court: | I don't know if the problem is his refusal to talk to police. I think the problem for him more is the fact that he knew what he was being charged with before they charged him. I mean, if you're an innocent man and you're brought in, how would you have said, are you charging me with armed robbery? I mean, how would you pick that out of the air? |
| Defense Counsel: | I don't know. Maybe they told him or something. Maybe that's what he heard, because they had already executed a search warrant at his estranged wife's house, and they had already executed a search warrant at his mother's house where he lived. |
| Court: | Okay. |
| Defense Counsel: | So obviously they had to leave copies of both search warrants there. |
| Court: | Okay. Okay. Fair enough. And why do you think that his refusal to speak to the police is indication of his guilt? Why do you think they would take it that way? |
| Defense Counsel: | Because it's been my experience. |
| Court: | That? |
| Defense Counsel: | That juries don't like when people refuse to talk to the police. |
| Court: | [Prosecutor]? |
| Prosecutor: | Innocent people refuse to talk to the police too. The jury has already been given the instruction as far as, you know, (inaudible). |
| Court: | I think it's factual. He didn't want to talk. It's not hearsay. I don't think it's highly prejudicial. And I think that you could definitely rehabilitate it, you know, into any level of prejudice that you think it might cause. The objection's overruled. |

6

After counsel returned to the trial tables, the court advised the detective that he could answer the question and the detective provided the following response:

> Detective Gaskins: Mr. Harris provided us with a false address, denied any involvement with the robbery, and then I believe he requested an attorney.[4]

The prosecutor then moved on to another topic. Defense counsel did not cross-examine the detective concerning the interview. Mr. Harris' invocation of his right to counsel during the police interview was not mentioned in either testimony or argument during the remainder of the trial.

*Searches of the Homes of Mr. Harris' Wife and of his Mother*

Detective Gaskins obtained a search warrant for the address that Mr. Harris provided during his police interview. The address turned out to be not a false address, but rather a former address. The woman who lived there – and whom Mr. Harris later identified as his wife[5] – told the police that Mr. Harris had not stayed there for some time and gave them the address of Mr. Harris' mother, Barbara Fallin, where she believed that Mr. Harris had been staying. When the police went to Ms. Fallin's address, Ms. Fallin consented to a search of the portion of the house where Mr. Harris kept belongings, but said that she had

---

[4] It is unclear from the detective's testimony at the trial whether Mr. Harris had been given his *Miranda* rights prior to making these statements.

[5] Detective Gaskins described the woman as a "former girlfriend" of Mr. Harris. During the defense case, Mr. Harris identified her as his wife, from whom he had separated in late 2013.

not seen him for a couple weeks, as she had asked him to leave the house. According to Detective Gaskins, no evidence was recovered in the search of either location.

*The Defense Case*

In his opening statement, defense counsel indicated that he was planning to call Ms. Fallin as an alibi witness on Mr. Harris' behalf. Defense counsel told the jury that Ms. Fallin would testify that Mr. Harris was at her house the entire night on the date of the robbery.

After the State rested its case, Mr. Harris, rather than Ms. Fallin, testified in his defense. Mr. Harris testified that his left arm had been amputated "mid-arm" as a result of a work accident in 2004.[6] Doctors were able to re-attach the arm, and he underwent multiple surgeries and physical therapy. Mr. Harris explained that he had regained feeling in his hand, but he was not able to grasp items or use his hand in the same manner as before the accident. Mr. Harris testified that he was right-handed, and that he had adapted to performing daily activities with one hand. He said that he had to use his right hand to put items in his left hand.

Mr. Harris testified that in late 2013 he had separated from his wife and moved in with his mother, where he was still living on January 16, 2014 – the day of the robbery at Ms. Binko's apartment. Mr. Harris said that he did not know Ms. Binko, Ms. Holmes, Mr.

_____

[6] During a pretrial conference, the court suggested that defense counsel describe Mr. Harris's hand as being "in a claw-like state" because "[y]ou can visually look at Mr. Harris and see that there is an issue with his hand ... anyone can look at Mr. Harris and see that his hand is not quite normal or regular."

8

Allen, or Reds. He denied robbing Ms. Binko or participating in a home invasion of her apartment. Mr. Harris said that he spent that day at his mother's house, that she was home with him the whole day, and that no one else was with them at the time of the robbery. Mr. Harris denied that he had given Detective Gaskins a false address when he told him the address where he had lived with his wife.

Mr. Harris did not call Ms. Fallin to testify at the trial; nor did the State call her as a rebuttal witness.[7]

*Jury Instruction Conference*

After the defense rested, the Circuit Court met with counsel to discuss the jury instructions. As had been earlier suggested by the Circuit Court,[8] defense counsel had requested a missing witness instruction related to the State's failure to call Reds as a witness. The Circuit Court then suggested that the State would also seek its own missing witness instruction with respect to the failure of the defendant to call Ms. Fallin as a

---

[7] During cross-examination by the prosecutor, Mr. Harris acknowledged that his mother was not present at the trial, but neither the State nor defense counsel elicited the reason for her absence. Mr. Harris testified that he had not paid rent to his mother while he lived with her, but that she was not his source of financial support. On redirect examination, Mr. Harris testified that he had given his mother money occasionally in the past, and that he gave her $75,000 in 2008 or 2009 from a settlement for his arm injury.

[8] At the outset of the trial, prior to jury selection, the Circuit Court and counsel briefly discussed the fact that the prosecution was having difficulty identifying Reds and locating Mr. Allen. (Mr. Allen was eventually located, detained as a material witness, and testified at trial; Reds was never located). At that time, the Circuit Court suggested that the defense would want the court to give a missing witness instruction as to those prosecution witnesses. However, nothing was resolved at that time concerning the jury instructions.

9

witness. The State opposed a missing witness instruction as to Reds, arguing that nobody had been able to locate or identify her and thus she was equally unavailable to both parties.[9] Defense counsel ultimately withdrew his request for that instruction.

The State then adopted the Circuit Court's suggestion and requested a missing witness instruction relating to the absence of Ms. Fallin. Defense counsel objected, arguing that the State had never requested a subpoena for Ms. Fallin and that there were reasons for her absence that were not relevant to the trial. The following colloquy took place:

> Court: Okay. Okay. If a witness could have given important testimony in issue with this case—and I imagine an alibi would be considered important testimony—and if the witness was peculiarly in the power of the defendant to produce—which she was, it's his mother—but was not called as a witness by the defendant, and the absence of that witness was not sufficiently accounted for or explained—which it was not—then you may decide that—I mean, how is this not applicable?
>
> Defense Counsel: Because it's not peculiarly within his power. He's in jail. He doesn't have the power to do anything.
>
> Court: Right. You are acting as his agent, [defense counsel].
>
> Defense Counsel: True.

---

[9] The prosecutor also referred to commentary in a bar publication that includes a pattern missing witness instruction. The commentary suggested that a party seeking a missing witness instruction should disclose that intention, out of the jury's presence, at the close of the opposing party's case in order to afford the opposing party an opportunity to call the missing witness or explain the reason for not doing so. *See* Maryland State Bar Association, Maryland Criminal Pattern Jury Instructions (2d ed. 2012), MPJI-Cr3:29, *Comment*. The procedure suggested in the commentary is based on this Court's decision in *Christensen v. State*, 274 Md. 133, 135 n.1 (1975). *See* Part II.B of this opinion.

10

| Court: | Okay. So you had the ability to either bring her here or subpoena her here as an alibi witness. The objection is overruled. [Criminal Pattern Jury Instruction] 3.29 missing witness instruction is being read. |

Defense counsel then argued that the instruction improperly shifted the burden of proof to the defendant to produce evidence. The Circuit Court agreed that the instruction would be improper if Mr. Harris had chosen not to testify himself, but reasoned that, because he had testified, the jury could consider his failure to call Ms. Fallin as a witness in assessing the credibility of his own testimony.

*Jury Instructions and Closing Argument*

Consistent with its ruling during the jury instruction conference, when the Circuit Court instructed the jury on the law, it included the following missing witness instruction:

> You have heard testimony about Barbara Fallin, who was not called as a witness in this case. If a witness could have given important testimony on an issue in this case, and the witness was peculiarly within the power of the defendant to produce but was not called as a witness by the defendant, and the action[10] of that witness was not sufficiently accounted for or explained, then you may decide that the testimony of that witness would have been unfavorable to the defendant.

During the State's closing argument, the prosecutor referred to Ms. Fallin's absence and urged the jury to draw an inference adverse to Mr. Harris. The prosecutor reminded the jury that defense counsel had identified her as an alibi witness in opening statement, but had not called her during the defense case and asked rhetorically "Where is his

___

[10] The trial transcript indicates that the court referred to "the action of that witness" instead of "the absence of that witness" as set forth in the pattern jury instruction. We cannot tell whether this is an error in transcription or in the court's recitation of the instruction.

11

mother?" The prosecutor returned to that theme later in his argument, asking: "Who can attest to the defendant's whereabouts, other than the defendant?" In response, defense counsel acknowledged Ms. Fallin's absence, but contended that the jury should not draw an adverse inference against Mr. Harris because a "person not testifying is non-evidence." In the State's rebuttal argument, the prosecutor twice returned to the absence of Ms. Fallin. He reiterated his question "Where is his mother?" and also reminded the jurors that "[t]he judge has instructed you … that … you can draw a reasonable inference to the fact that her testimony would have possibly been unfavorable to this defendant."

Neither the prosecutor nor defense counsel referred in their arguments to Detective Gaskins' testimony that Mr. Harris had invoked his right to an attorney during his police interview.

*Verdict and Appeal*

The jury found Mr. Harris guilty of second degree assault against Mr. Allen; and conspiracy to commit robbery with a dangerous weapon, robbery, conspiracy to commit robbery, conspiracy to commit first-degree assault, second-degree assault, conspiracy to commit second-degree assault, theft less than $1,000, and conspiracy to commit theft less than $1,000, all against Ms. Binko. The jury acquitted him of six assault charges, robbery with a dangerous weapon, and use of a firearm in the commission of a felony or crime of violence. The Circuit Court later sentenced Mr. Harris to an aggregate 10-year sentence.

12

Mr. Harris appealed. In an unreported opinion, the Court of Special Appeals affirmed the convictions.[11] *Harris v. State*, No. 484, 2017 WL 168446 (Md. Ct. Spec. App. Jan. 17, 2017) (unreported). The intermediate appellate court held that the Circuit Court erred when it permitted Detective Gaskins to testify that Mr. Harris had requested an attorney. But the court concluded that, in light of the fingerprint evidence linking Mr. Harris to the crime, the error was harmless beyond a reasonable because it was a "brief remark," and there had been no further reference to it in testimony or argument during the remainder of the trial. *Id.* at *5.

The Court of Special Appeals also found that the trial court did not abuse its discretion when it gave the missing witness instruction. It reasoned that there was a sufficient factual basis to support the conclusion that Ms. Fallin's relationship with Mr. Harris rendered her testimony unavailable to the State as a practical matter and peculiarly within Mr. Harris' control. Thus, his failure to call her as a witness would support an inference that her testimony would be unfavorable to him. *Id.* at *11-12. Judge Nazarian dissented from that holding. He would have held that the Circuit Court abused its discretion when it gave the missing witness instruction and that, together with the erroneous admission of testimony concerning Mr. Harris' invocation of his right to counsel, that error required reversal of the conviction. *Id.* at *15.

We granted *certiorari* to consider the following issues:

---

[11] Agreeing with a concession made by the State, the Court of Special Appeals held that the trial court erred in imposing multiple sentences for conspiracy and vacated the sentences for conspiracy to commit theft, conspiracy to commit first degree assault, conspiracy to commit second degree assault, and conspiracy to commit robbery.

13

(1)    Whether the Circuit Court abused its discretion when it gave a missing witness instruction advising the jury that it could draw an inference adverse to Mr. Harris based on his failure to call his mother as a witness.

(2)    Whether it was a harmless error when the Circuit Court permitted Detective Gaskins to testify that Mr. Harris had invoked his right to counsel during a custodial interview.

For the reasons set forth below, we hold that the Circuit Court should not have given the missing witness instruction under the circumstances of this case. Because we reverse Mr. Harris' convictions for that reason, and remand the case for a new trial, we need not address whether the erroneous reference to his invocation of his right to counsel was harmless.

## II

### The Missing Witness Rule

**A.    *Genesis of the Missing Witness Rule***

Although technically not a rule, the concept known as the "missing witness rule"[12] refers to the permissible inference that a factfinder may draw from the absence of a potential witness who might have knowledge of facts at issue in the case. If the factfinder determines that the witness is "peculiarly available" to one party, the absence of the witness is ascribed to that party. The factfinder is then permitted to infer that the party did not call

---

[12] It is also sometimes referred to as the "empty chair doctrine." *See* Joseph F. Murphy, Jr., Maryland Evidence Handbook (4th ed. 2010 & 2017 Cum. Supp.) at §409[B].

the witness because whatever testimony that individual would have given would be unfavorable to that party.

Although there are common law antecedents for the doctrine, the current understanding of the missing witness rule is often traced to a Supreme Court case from the late nineteenth century. *Graves v. United States*, 150 U.S. 118 (1893).[13] That case concerned the propriety of a prosecutor's closing argument to the jury in a criminal case. In that argument, the prosecutor suggested that the absence of the defendant's wife from the trial undermined his alibi defense to a murder charge, although other witnesses had testified in support of the alibi. The Court summarized succinctly the missing witness rule:

> The rule, even in criminal cases, is that, if a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that the testimony, if produced, would be unfavorable.

150 U.S. at 121.[14] While the Supreme Court referred to the missing witness rule as a "presumption" in *Graves*, most courts have treated it as a permissible inference rather than a presumption.[15]

---

[13] *See, e.g., Christensen v. State*, 21 Md. App. 428, 429-30 (1974), *rev'd,* 274 Md. 133 (1975); *State v. Tahair*, 772 A.2d 1079, 1082-83 (Vt. 2001); *State v. Brewer*, 505 A.2d 774, 776 (Me. 1985); R.H. Stier, Jr., *Revisiting the Missing Witness Inference – Quieting the Loud Voice from the Empty Chair*, 44 Md. L. Rev. 137, 138-39 (1985).

[14] Ironically, perhaps, the Supreme Court reversed the conviction in *Graves* on the basis that the missing wife would not have been a competent witness for either side and therefore the "presumption" would not be appropriate in that case. Thus, its statement of the missing witness rule was dicta.

[15] A presumption would *require* the factfinder to draw the inference unless the party rebutted it, while a permissible inference would not necessarily require a rebuttal. In the context of a criminal case, some courts have found the burden-shifting resulting from a

In the years since the *Graves* decision, developments in constitutional law, changes in the rules of evidence and discovery, and questions concerning the accuracy of the adverse inference promoted by the missing witness rule have seriously weakened its viability – at least in the context of criminal case in which the inference is to be taken against the defendant. In addition, courts have expressed concerns when the missing witness rule appears not only in a party's argument, but is also endorsed in a court's jury instruction. In this case we are primarily concerned with the missing witness rule as it appears in a jury instruction given by the trial court.

**B.** **Missing Witness Instruction in a Criminal Case**

A trial court's jury instructions in a criminal case serve a number of purposes. They provide the jury with general guidelines on how to carry out its duties as factfinder (*e.g.*, burden of proof, presumption of innocence, what is and is not evidence). They outline the law concerning the particular charges in the case and what elements must be proven for the jury to reach a guilty verdict. They may, as appropriate, provide guidance to the jury on how to evaluate particular types of evidence or testimony (*e.g.*, expert testimony, impeachment evidence, other crimes evidence).

A missing witness instruction calls the jury's attention to the *absence* of evidence (*i.e.*, the imagined testimony of the missing witness), allows the jury to attribute that absence to one of the parties, and permits the jury to draw a negative inference against that

presumption to be inappropriate as to the defendant. *See Russell v. Commonwealth*, 223 S.E.2d 877, 879 (Va. 1976); *McGlone v. Superior Trucking Co., Inc.*, 363 S.E.2d 736, 742 (W.Va. 1987) (in the criminal context, a missing witness instruction is "fraught with constitutional implications not present in a civil case") (dicta).

party for failing to produce that evidence. A missing witness instruction adverse to a defendant is a rare instance where the trial court endorses an evidentiary inference promoted by the prosecution – an inference based not on evidence or the conduct of the defendant, but on the failure of the defendant to produce evidence. Of course, the jury has little or no basis for assessing the credibility of the imagined testimony of the absent witness. In that the instruction concerns the weight to be given to potential evidence that the jury did not hear, it is a cousin of the disfavored "anti-CSI effect" instruction, which also concerns evidence that theoretically might have been presented to the jury but was not.[16]

### 1. Constitutional Considerations

In many criminal cases, the ultimate "missing witness" may be the defendant, if the defendant elects not to testify. At the time of the *Graves* decision, a version of a missing witness instruction could be given in many jurisdictions as to the failure of a defendant to testify. For example, in *Griffin v. California*, 380 U.S. 609 (1965), a California trial court

---

[16] In an "anti-CSI effect" instruction, the trial court informs the jury that there is no legal requirement that the State employ any particular investigative or scientific test to prove its case. It is designed to counter the perceived expectation that jurors assume that police always employ sophisticated scientific techniques that are the subject of fictional police television shows. Although this Court has not declared an "anti-CSI effect" instruction improper *per se*, it has discouraged trial courts from giving that instruction and reversed convictions when the instruction was not appropriate. *See Stabb v. State*, 423 Md. 454, 462-63 (2011); *Atkins v. State*, 421 Md. 434 (2011). In *Atkins*, this Court opined that "[t]he better practice is for a trial judge to refrain from commenting on inferences to be drawn by the jury." 421 Md. at 454 n.8.

gave the following instruction to the jury in a murder case – an instruction endorsed by the California constitution:

> As to any evidence or facts against him which the defendant can reasonably be expected to deny or explain because of facts within his knowledge, if he does not testify … the jury may take that failure into consideration as tending to indicate the truth of such evidence and as indicating that among the inferences that may be reasonably drawn therefrom those unfavorable to the defendant are the more probable.

380 U.S. at 610. In closing argument, the prosecutor in *Griffin* also emphasized the adverse inference to be drawn from the defendant's failure to testify.

As is well known, that case found its way to the Supreme Court where the Court held that the prosecutor's argument and the trial court's instruction violated the self-incrimination clause of the Fifth Amendment – a holding that would apply not only in federal courts, but also in state courts by virtue of the Court's then-recent decision in *Malloy v. Hogan*, 378 U.S. 1 (1964).

To the extent that a missing witness instruction appears to require a defendant to produce certain evidence or suffer adverse consequences, it is also in tension with the principle that the prosecution must prove each element of a charged criminal offense beyond a reasonable doubt. *See In re Winship,* 397 U.S. 358, 364 (1970). In a jury instruction that most criminal litigators could recite in their sleep, a trial court typically instructs the jury that a defendant is presumed to be innocent, that the State bears the burden of proof beyond a reasonable doubt throughout the trial of a criminal case, and that the defendant has no obligation to call witnesses or to present evidence. *See, e.g.,* Maryland State Bar Association, *Maryland Criminal Pattern Jury Instructions* (2d ed. 2012), MPJI-

18

Cr 2:02 (Presumption of Innocence and Reasonable Doubt); *see also id.,* MPJI-Cr 3:17 (Election of Defendant Not to Testify).

It has also been noted that, because the missing witness rule concerns an inference about the content of testimony from a witness who does not actually testify at trial, it may also implicate a defendant's right of confrontation under the Sixth Amendment of the United States Constitution. *See Hayes v. State*, 57 Md. App. 489, 499-500 (Bell, J.) *cert. denied*, 300 Md. 90 (1984).

2. Changes in Evidentiary and Discovery Rules

Various common law doctrines have been associated with the reasoning underlying the missing witness rule. However, changes in evidentiary and discovery rules have rendered those rationales less compelling.

The missing witness rule was once linked to the common law "voucher rule." That was the concept that a party "vouched" for the credibility and veracity of the witnesses that the party called to the stand. *See Walker v. State*, 373 Md. 360, 383-84 (2003). Under the voucher rule, one might assume that the witnesses called by a party would be favorable to that party's position and that potential witnesses that the party does not call would be unfavorable. *See, e.g., State v. Tahair*, 772 A.2d 1079, 1084 (Vt. 2001); *State v. Malave*, 737 A.2d 442, 448-49 (Conn. 1999); *State v. Brewer*, 505 A.2d 774, 776-77 (Me. 1985). However, modern rules of evidence, such as Maryland Rule 5-607,[17] make clear that a

---

[17] Maryland Rule 5-607 provides that "[t]he credibility of a witness may be attacked by any party, including the party calling the witness." The committee note to that rule states that it "eliminates the common law 'voucher' rule." Many states have adopted similar rules which, like the Maryland rule, are based on Federal Rule of Evidence 607.

party no longer vouches for a witness by calling that individual to the stand. Indeed, under Rule 5-607, a party may attack the credibility of a witness that the party calls to the stand. There is thus no presumption that the witnesses that a party calls will be favorable to it or, conversely, that those the party does not call will be unfavorable.

Similarly, as the Supreme Court opinion in *Graves* indicated, the missing witness rule was viewed as an incentive for parties to produce as witnesses those individuals who had knowledge of the facts of a case. However, modern criminal discovery rules provide for greater exchange of information by parties, such that each party has more information in advance of trial as to the universe of potential witnesses and their likely testimony. *See, e.g.*, *Tahair*, 772 A.2d at 1084; *Malave*, 737 A.2d at 447; *Brewer*, 505 A.2d at 777 n.2 (Me. 1985); *cf. McGlone v. Superior Trucking Co., Inc.*, 363 S.E.2d 736, 742 (W.Va. 1987). For example, under Maryland Rule 4-263(e)(4), a defendant in a criminal case who intends to present an alibi defense must identify for the State the individuals that the defendant plans to call to support the alibi.[18]

---

[18] Some have also related the missing witness rule to the spoliation doctrine and the best evidence rule. *See* Stier, note 13 above, at 139-43.

The spoliation doctrine, when incorporated in a jury instruction, refers to the destruction or concealment of evidence by a party – conduct of that party that may reveal the party's intent. *See e.g.,* Maryland State Bar Association, Maryland Criminal Pattern Jury Instructions (2d ed. 2012), MPJ1-Cr 3:26 (concealment or destruction of evidence as consciousness of guilt), MPJI-Cr 3:27 (suppression, alteration or creation of evidence as consciousness of guilt); Maryland State Bar Association, Maryland Civil Pattern Jury Instructions (5th ed. 2017) MPJI-Cv 1:16 (spoliation). By contrast, the missing witness rule is based on a party's litigation decision – what in fact may be counsel's decision – whether to call a particular witness to the stand.

3.      Accuracy of the Rationale of the Missing Witness Rule

The rationale for the missing witness rule is at best questionable. *See Tahair*, 772 A.2d at 1084; *Malave*, 737 A.2d at 449. Most experienced litigators prefer to try a "lean" case – or come to regret it if they do not.[19] Counsel seldom call every witness who may have favorable testimony. There may be many reasons why a potential witness does not make the cut, few of which have anything to do with whether what the witness would say would be favorable to the party. As one court has noted, "the decision to call a witness often turns on factors which have little to do with the actual content of the [witness'] testimony. Considerations of cumulation and jury fatigue may preclude calling a witness who is entirely helpful; calculations that a witness may help a lot but hurt a little may compel restraint when counsel believes that [a] burden is already met. … [Q]uestions of demeanor and credibility, hostility, and the like may influence" a decision not to call a witness whose testimony would be favorable. *United States v. Busic*, 587 F.2d 577, 586 (3d Cir. 1978), *rev'd on other grounds*, 446 U.S. 398 (1980).

In light of the potential inaccuracy and unfairness of the missing witness rule, courts have added various qualifications and conditions for its use and "erect[ed] procedural

---

The best evidence rule governs what may be admitted to prove the content of a writing, recording, or photograph. *See, e.g.,* Maryland Rule 5-1001 *et seq.* It is only distantly related, if at all, to the missing witness rule in that provides direction to a court whether to admit a duplicate or other evidence of contents when the "best evidence" (the original) is absent.

[19] Many readers of appellate opinions would probably prefer that the writer of an appellate opinion produce a "lean" opinion and regret it when the writer does not. But this may simply be another instance in which an appellate judge is different from a litigator.

21

barriers for counsel to surmount before the substantive propriety of the inference will even be considered." R.H. Stier, Jr., *Revisiting the Missing Witness Inference – Quieting the Loud Voice from the Empty Chair*, 44 Md. L. Rev. 137, 151 (1985). An attempt in 1985 to simply restate the missing witness rule with all its accrued qualifications and conditions found that the succinct single sentence of *Graves* had ballooned into the better part of two pages of a law review article. *Id.*

4. Abandonment of the Missing Witness Instruction in Other Jurisdictions

A growing number of jurisdictions have limited the use of a missing witness instruction in criminal cases, at least to the extent that it would allow an adverse inference based on the failure of a defendant to call a witness.

*State Jurisdictions*

Courts in some states have severely limited the use of a missing witness instruction. For example, in *State v. Hill*, the New Jersey Supreme Court stated:

> We now hold that *Clawans* charges [the New Jersey term for a missing witness instruction] generally should not issue against criminal defendants. The inclusion in a criminal trial of a *Clawans* charge from the court risks improperly assisting the State in its obligation to prove each and every element of the charged crime beyond a reasonable doubt.

974 A.2d 403, 416 (N.J. 2009). *See also Commonwealth v. Shatret*, 499 N.E. 2d 1208, 1211 (Mass. App. 1986) ("Circumspection in this matter is especially called for where the inference would run against a defendant in a criminal prosecution, for the inference may come uncomfortably close to involving constitutional rights").

Other states have completely abandoned the use of a missing witness instruction in criminal cases with respect to defendants. One state supreme court has noted the "growing wariness" about the use of the instruction in criminal cases and opined that the missing witness instruction has "outlived its usefulness in criminal trials and should be abandoned." *State v. Tahair*, 772 A.2d 1079, 1080, 1083 (2001); *see also State v. Brewer*, 505 A.2d 774 (Me. 1985); *State v. Malave*, 737 A.2d 442 (Conn. 1999).

Some state supreme courts still allow a prosecutor to argue a missing witness inference in appropriate circumstances, but hold that endorsement of the inference "has no proper place in the judge's statement of the law" and that a missing witness instruction "even in its limited and restricted uses, brings about more problems than solutions." *State v. Hammond*, 242 S.E.2d 411, 416 (S.C. 1978); *see also Henderson v. State*, 367 So.2d 1366, 1368 (Miss. 1979) (adopting rationale of *Hammond*).

Finally, some state supreme courts have not only abolished a missing witness instruction with respect to a potential but absent defense witness, but have also forbidden prosecutorial argument based on the "missing witness rule" as impermissibly shifting the burden of proof. *See Ross v. State*, 803 P.2d 1104, 1105 (Nev. 1990); *State v. Caron*, 218 N.W. 2d 197, 200 (Minn. 1974); *State v. Jefferson*, 353 A.2d 190, 199 (R.I. 1976) (adopting rationale of *Caron*), *overruled on other grounds*, *State v. Caruolo*, 524 A.2d 575 (R.I. 1987).

*Federal Jurisdictions*

In the federal courts, the vast majority of cases concerning missing witness instructions deal with whether a trial court should have given such an instruction involving

23

an inference against the government rather than against the defendant. Indeed, the pattern instructions in a number of circuits advise trial courts *not* to give such an instruction with respect to a defendant. K. F. O'Malley, *et al*., 1A Federal Jury Practice and Instructions (6th ed. & Feb. 2018 update) §14.15. For example, the missing witness instruction in the First Circuit refers only to a missing government witness. Although the commentary allows for the possibility it could be revised to apply a potential defense witness, it states that a trial court should "exercise extreme caution" in doing so and should reiterate, as part of any such instruction, the principle that there is no obligation on the defendant to call any witnesses or produce any evidence. *Id.* In the Seventh Circuit, "[i]t is the view of the Committee that a missing witness instruction should not be given." *Id*. (adding that any such instruction should reiterate the principle that a defendant has no duty to call witnesses or produce evidence). The Eighth Circuit does not have a model missing witness instruction because of the "limited circumstances" in which it would be appropriate and provides that such an instruction should never be given in a case where a defendant has offered no evidence. *Id.*

## C.     *The Evolution of the Missing Witness Rule in Maryland*

Maryland appellate courts have also treated the missing witness rule with some skepticism – at least insofar as it involves a jury instruction that authorizes a jury to draw an inference adverse to a defendant in a criminal case.

1. *Christensen* – a Preferred Procedure; Requiring a No-Inference Instruction

This Court first grappled with the appropriateness of a missing witness inference in the modern era in *Christensen v. State*, 274 Md. 133 (1975).[20] The *Christensen* decision is significant for (1) its holding that the use of the missing witness inference against a defendant is constrained by the constitutional principles that govern criminal trials and (2) dicta concerning the procedure to be followed when a party seeks a missing witness instruction.

That case concerned an alleged rape. At trial, neither the prosecution nor the defense called an alleged accomplice to the crime as a witness. In closing argument, the prosecutor suggested that the jury should draw an inference adverse to the defendant from the absence of that potential witness. The defense requested that the trial court instruct the jury to the contrary – that the defendant had no duty to produce the alleged accomplice and that no inference could be taken against the defendant for not doing so. The requested instruction was precisely the opposite of a missing witness instruction – what might be called an "anti-missing witness" or "no-inference" instruction. The trial court declined to give a no-inference instruction.

Following the defendant's conviction, he challenged the constitutionality of the use of the missing witness rule in criminal cases. In a unanimous decision authored by Judge

---

[20] This was apparently the first reported instance in which the missing witness rule was invoked in a criminal case in Maryland. *See Bing Fa Yuen v. State*, 43 Md. App. 109, 111 (1979) ("[U]ntil *Christensen*…, Maryland had never recognized the application of the rule in criminal cases.").

Marvin Smith, the Court did not reach the constitutional issue[21] because it held that the missing witness inference did not apply in a situation, like the case before it, involving a defendant-accomplice relationship. 274 Md. at 134-35 (quoting 1 Underhill, Criminal Evidence §45 (rev. 6th ed. 1973) and citing 1 Wharton, Criminal Evidence §148 (13th ed. 1972)). The Court noted that an alleged accomplice might well assert his Fifth Amendment privilege not to testify and thus prove unavailable, even if his testimony would exculpate the defendant on trial. 274 Md. at 140. Thus, Judge Smith wrote, "the defendant would be faced with a Hobson's choice incompatible with our concept that a defendant is innocent until proven guilty beyond all reasonable doubt and that the burden of proof never shifts from the State." *Id*.

The Court also held that the trial court should have given the defendant's requested no-inference instruction – that no inference could be drawn against the defendant with respect to the absence of the alleged accomplice – and remanded the case for a new trial. *Id.* In holding that the trial court should have instructed the jury that it could *not* draw an inference adverse to the defendant, the Court implicitly also found the prosecutor's argument that the jury should draw an adverse inference to be improper.

The *Christensen* case thus did not concern whether a trial court should give – or decline to give – a missing witness instruction. Rather, it held that the missing witness rule, whether in argument or instruction, had no place in the case before it. Accordingly,

---

[21] A couple years later, the Court of Special Appeals appeared to register a complaint that this Court had dodged the constitutional issue that the intermediate appellate court had teed up in *Christensen*. *See Pierce v. State*, 34 Md. App. 654, 658-59, *cert. denied*, 280 Md. 732, *cert. denied,* 434 U.S. 907 (1977).

a defendant in a criminal case may actually be entitled to what amounts to an "anti-missing witness instruction" in certain circumstances[22] – *i.e.*, the jury may *not* draw an adverse inference against the defendant – in light of the constitutional principles that govern criminal trials. However, the Court did not rule out the possibility that a missing witness instruction might be appropriate in some circumstances. In a footnote, the Court indicated the "preferred procedure" that a trial court should follow when a missing witness instruction is requested and quoted at length from a decision of the New Jersey Supreme Court describing that procedure. *Id.* at 135 n. 1 (*quoting State v. Clawans*, 183 A.2d 77 (N.J. 1962)).[23]

Under the "preferred procedure," the party seeking a missing witness instruction concerning the opposing party's failure to call a witness is to advise the trial court and opposing party of its intention out of the presence of the jury at the close of the opposing party's case. The opposing party should then be given an opportunity to call the missing witness or to demonstrate to the court "by argument or proof the reason for the failure to

---

[22] The Court of Special Appeals has characterized the instruction required in *Christensen* as a "preclusory instruction" while characterizing a missing witness instruction as a "highlighting instruction" – *i.e.*, the instruction required in *Christensen* would preclude a jury from drawing an adverse inference while a missing witness instruction highlights that an adverse inference may be drawn. *Bing Fa Yuen*, 43 Md. App. 113 n.1.

Whether, as a matter of litigation strategy, a defendant would actually insist on such a preclusory instruction is another matter. Sometimes telling someone not to think about something is a sure way to get them to think about it.

[23] As noted earlier, the New Jersey Supreme Court subsequently held that a *Clawans* charge should not be given in a criminal case concerning the absence of a witness thought to be favorable to the defendant. See Part II.B.4 of this opinion.

call" the witness. 274 Md. at 135 n.1. The trial court would then determine whether a missing witness inference is appropriate or not. *Id.*

2. *Robinson* – Missing Witness Argument versus Jury Instruction

While the *Christensen* decision constrained the use of a missing witness instruction in a criminal case both substantively and procedurally, the Court's next treatment of the missing witness rule appeared to accept a broader use of a missing witness instruction in a criminal case, although the Court was closely divided on the propriety of that instruction. In *Robinson v. State*, 315 Md. 309 (1989), the defendant was convicted of an offense related to his use of a stolen car. At trial, the defendant testified that he had received the car from a friend named "Alvin Johnson" whom, he said, he had pointed out to the police. "Alvin Johnson" was not called as a witness, and the trial court gave a missing witness instruction that permitted the jury to draw an inference adverse to the defendant. Following his conviction, the defendant appealed on the ground that the trial court should not have given the missing witness instruction.

In a 4-3 decision, this Court held that the missing witness instruction was appropriately given. It observed that Alvin Johnson's existence and involvement were established only by the defendant's own testimony and that it was not uncommon for a person found in possession of stolen property to fabricate a story that another person had provided the stolen property. 315 Md. at 316-17. The majority opinion conceded that Alvin Johnson, if he existed, would have a Fifth Amendment right not to testify, but noted that he could have been called and questioned outside the presence of the jury to determine whether he would invoke his privilege not to testify. The majority opinion also equated

28

the circumstances under which a prosecutor could argue a missing witness instruction with those under which a trial court could give such an instruction:

> If the argument fairly may be made, then it stands to reason that a sufficient foundation of facts exists upon which the inference may be drawn. Where the inference may be drawn, it will ordinarily be within the discretion of the trial judge to grant or refuse a missing witness instruction.

*Id.* at 318-19 (footnotes omitted). However, in a footnote, the majority opinion emphasized that a trial court is not required to give the instruction. *Id.* at 319 n. 7.

In a dissenting opinion joined by Judge Eldridge and Judge Cole, Judge William H. Adkins II observed that "courts have reacted to the [missing witness] rule's potential inaccuracy and unfairness by decreasing the number of situations in which the adverse inference might be applied" and cited, as an example, the "prudent limitation" set forth in the *Christensen* decision. 315 Md. at 323 (quoting Stier, 44 Md. L. Rev. at 151). Judge Adkins also observed that the "inference is at best a weak one" and that it raises constitutional issues in the criminal context. *Id.* at 323 n.1. He argued that the *Christensen* decision, properly applied, precluded a missing witness instruction in the case before the Court. In contrast to the majority opinion, Judge Adkins suggested that there should be a higher bar for a jury instruction endorsing a missing witness inference, even if the prosecutor in argument might legitimately ask the jury to draw that inference:

> The issue in this case … is not what inferences the jury might have drawn or what arguments might be proper. … The issue is whether it was proper for the judge to give the instruction he gave. That instruction … added a judicial imprimatur to the adverse inference that might be drawn from [Johnson's] absence.

*Id*. at 327 n. 2.

29

3. *Davis* – Cautioning Against an Instruction Even if Argument is Proper

By the next time the Court addressed the missing witness rule at length, Judge Adkins had left the Court, but his distinction between what is permissible in argument and what may be the subject of a jury instruction became the centerpiece of a unanimous portion of the Court's opinion.[24] *Davis v. State*, 333 Md. 27 (1993), *overruled on other grounds*, *Pearson v. State*, 437 Md. 350 (2014).

In that case, the defendant was charged with various drug offenses as a result of his presence with cash at a drug deal. The defendant testified that he was present at the scene of the drug deal because he was on his way to buy food for his family; another defense witness testified that the defendant had received $10 from his wife for that purpose; the wife, though present in the courtroom, was not called to testify. 333 Md. at 47. During the State's closing argument, the prosecutor posed the question of why the wife had not been called to testify if she would have corroborated the defense. *Id*. at 47-48. While the trial court overruled a defense objection to that argument, it did not give a missing witness instruction itself.

On appeal, the defendant contended that the trial court had erred in permitting the prosecutor to make an argument that the jury could draw an inference adverse to him from the failure of his wife to testify. The Court rejected that contention, holding that the marital relationship was sufficiently close as to render the wife peculiarly available to the

---

[24] The *Davis* Court splintered on the other main issue before it, which concerned *voir dire* procedure, but neither the concurring opinion nor dissenting opinion expressed disagreement with the majority opinion's holding on the missing witness issue.

defendant. 333 Md. at 50-51. The Court went on to emphasize that the missing witness inference was raised in the State's closing argument rather than in a jury instruction by the trial court. Stating that the prerequisites of the missing witness rule must be "more rigidly applied" for a jury instruction to be given, the Court drew a contrast between the two ways in which the adverse inference could be suggested to the jury:

> Where a party raises the missing witness rule during closing argument, its use is just that – an argument. Trial judges typically instruct the jury, as in this case, that the parties' arguments do not constitute evidence ….

> In contrast to the argument context is the trial judge's instruction to the jury. In [that] case, the inference is communicated to the jury as part of the judge's binding jury instructions, creating the danger that the jury may give the inference undue weight. [A] trial court should be especially cautious and closely abide by the requirements set out in *Christensen*.

*Id*. at 52. *See also Patterson v. State,* 356 Md. 677 (1999) (trial court properly allowed counsel to make "missing evidence" argument while declining to give "missing evidence" jury instruction); *Lowry v. State*, 363 Md. 357, 371-75 (2001) (same); *Bruce v. State*, 318 Md. 706 (1990) (there was a sufficient basis for prosecutor to make missing witness argument with respect to defendant's girlfriend, when defendant testified he was with the girlfriend on the day of the murder).

4.      *Bereano* – The Need for Adequate Notice

This Court's most recent consideration of the missing witness rule occurred 10 years ago in the context of a case arising out of a civil administrative proceeding in which the State Ethics Commission decided that a lobbyist had violated the Public Ethics Law. *Bereano v. State Ethics Commission*, 403 Md. 716 (2008). In a 5-2 decision, the Court

31

held that the Commission had erred in relying on the missing witness rule as part of its reasoning in its written decision. As the issue arose in a civil context and involved neither a closing argument to a jury nor a jury instruction, the circumstances are readily distinguishable from those of this case. Nonetheless, Judge Harrell's careful consideration of the underpinnings and operation of the missing witness rule in the court's majority opinion is instructive.

After surveying a number of authorities and cases in Maryland and elsewhere, the majority opinion concluded that the justification for the inference was "limited," that many courts had accordingly curtailed its use, and that it should be invoked "prudently." 403 Md. at 751-55. The majority opinion noted that, "(b)ecause of the limited justification for the rule and the chance of an erroneous inference being drawn, courts often require early notice from a party intending to make a missing witness argument or intending to request such an instruction." *Id*. at 752 (internal quotation marks and citation omitted). The majority opinion was troubled by the fact that no notice had been given that the agency would rely on a missing witness rule before it drew an adverse inference based on that doctrine in its written decision and that no findings had been made as to the prerequisites for application of the missing witness rule – *e.g.*, the peculiar availability of the witness to one side.

5. Summary

The following principles concerning the missing witness rule can be derived from this Court's decisions described above:

- Basic prerequisites:

  (1) There is a witness
  (2) Who is peculiarly available to one side because of a relationship of interest or affection
  (3) Whose testimony is important and non-cumulative
  (4) Who is not called to testify[25]

- Whether a Witness is Peculiarly Available:

  An accomplice-defendant relationship does not necessarily mean that the accomplice is "peculiarly available" to the defendant given the possibility that the accomplice would assert the privilege against self-incrimination. A witness who will assert the privilege against self-incrimination is not "available" and cannot be the subject of a missing witness instruction. If a "missing" witness claims his or her privilege against self-incrimination, that claim may be tested outside the jury's presence. *Christensen, Robinson.*

- Missing Witness Argument versus Missing Witness Instruction:

  In cases in which it may be appropriate for the prosecutor to ask the jury to draw a missing witness inference adverse to the defendant, the trial court should not necessarily give a missing witness instruction. A trial court should be "especially cautious" in considering whether to give a missing witness instruction adverse to a defendant in a criminal case. *Davis.*

- Procedure:

  When a party intends to ask the trial court to give a missing witness instruction, the party should give advance notice to the opposing party and raise the issue at a time when the opposing party has an opportunity to call the allegedly missing witness or provide proof that the witness is not peculiarly available to that party. *Christensen*, *Bereano*.

- No-Inference Instruction:

  In some circumstances in which a defendant has not called a witness that might be thought to be favorable to the defendant, the trial court may *not* give a missing

---

[25] This formulation has been stated and applied by the Court of Special Appeals on several occasions, including this case. *Harris*, 2017 WL 168446 at *8; *see also Woodland v. State*, 62 Md. App. 503, 510, *cert. denied*, 304 Md. 96 (1985); *see also Dansbury v. State*, 193 Md. App. 718, 742 (2010).

33

witness instruction and, indeed, could be required to give, at the defendant's request, an instruction that no adverse inference should be drawn by the jury against the defendant. *Christensen*.

## III

## Discussion

### A. *Standard of Review*

In a criminal jury trial, the trial court "may, and at the request of a party shall, instruct the jury as to the applicable law and the extent to which the instructions are binding." Maryland Rule 4-325(c).[26] Instructions on the law may cover such things as the burden of proof, presumption of innocence, and the elements of the crimes charged. However, instructions as to facts and factual inferences are normally not required. *Patterson v. State,* 356 Md. 677, 684 (1999). A missing witness instruction, which concerns an inference to be drawn from evidence – or the lack thereof – is of the latter variety. Thus, a trial court has discretion not to give a missing witness instruction even if a party requests the instruction and the necessary predicate for such an instruction has been established. *See Robinson*, 315 Md. at 319 n.7. A trial court has no discretion to give a missing witness instruction where the facts do not support the inference. *Id.*

We review a trial court's decision to give a jury instruction concerning inferences to be drawn from the absence of evidence for abuse of discretion. *See Hall v. State*, 437 Md. 534, 539 (2014) (review of trial court's decision to give "anti-CSI effect" instruction). A trial court abuses its discretion if it commits an error of law in granting or denying a

---

[26] The court need not give a requested instruction if the matter is fairly covered by the instructions actually given. Maryland Rule 4-325(c).

request for such an instruction. *Id.* "Thus, while the trial court has discretion, we will reverse the decision if we find that the defendant's rights were not adequately protected." *Cost v. State*, 417 Md. 360, 368-69 (2010) (review of trial court's decision whether to give "missing evidence" instruction).

**B.      *Whether the Circuit Court Erred in Giving a Missing Witness Instruction***

*Failure to Follow the Preferred Procedure*

In deciding to give the missing witness instruction as to Ms. Fallin, the Circuit Court did not follow the "preferred procedure" set forth in *Christensen*. As indicated in *Christensen* and emphasized in *Bereano*, that procedure provides a party with notice of a trial court's intention to give the proposed instruction and an opportunity for the party either to call the witness or to persuade the court that the prerequisites of missing witness rule are not established.

In this case that procedure was essentially followed in the Circuit Court's consideration of a potential missing witness instruction adverse to the State. The possibility that the court would give a missing witness instruction concerning Reds and the then-missing Mr. Allen was first broached in a pretrial conference. The prosecution later located and called Mr. Allen as a witness. In opposing such an instruction as to the still-missing Reds, the prosecutor was able to refer to the commentary that accompanies the pattern missing witness jury instruction and successfully argue to the Circuit Court that the criteria for giving the instruction were not met as to Reds.

By contrast, the prosecution provided no notice of an intention to ask for a missing witness instruction as to Ms. Fallin. Indeed, the prosecutor only made the request after the

35

Circuit Court initiated the idea during the jury instruction conference after both parties had rested. The only rationale for the instruction offered by the prosecutor was that Ms. Fallin had been mentioned in the defense opening statement. As a result of the lack of notice, perhaps, the discussion of the merits of giving the instruction with respect to the absence of Ms. Fallin was truncated.

*Application of the Peculiar Concept of Peculiar Availability*

In considering whether to give the missing witness instruction as to Ms. Fallin, the Circuit Court understood that an absent witness must be "peculiarly available" to one side for the missing witness rule to be invoked. However, its consideration of that issue was limited. It was undisputed that Ms. Fallin was physically available to both the prosecution and the defense and could have easily been subpoenaed by the State as well as Mr. Harris. The question was whether she was unavailable to the State as a practical matter. The Circuit Court relied solely on the fact that she was the mother of Mr. Harris.

Although courts have referred to relationships of "interest or affection" as supporting such a finding, a mother-son relationship does not *per se* render a mother "peculiarly available" to her son. *See Dansbury v. State,* 193 Md. App. 718, 748 (2010) (defendant's mother and aunt not peculiarly available to defendant when they were outside the courtroom during trial); *Hayes v. State*, 57 Md. App. 489, 499-500, *cert. denied*, 300 Md. 90 (1984) (defendant's brother-in-law not peculiarly available to defendant); *see generally* Annotation, *Adverse presumption or inference based on party's failure to produce or examine family member other than spouse – modern cases*, 80 ALR 4th 337, §5. "The mere fact that a witness may personally favor one side over the other does not

36

make that witness peculiarly unavailable to the other side." *Bereano* 403 Md. at 744. In this case, the Circuit Court's analysis began – and ended – with the family relationship between Mr. Harris and Ms. Fallin: "It's his mother."

In its opinion, the Court of Special Appeals supplemented the Circuit Court's analysis with additional facts culled from the record which, it believed, supported the premise that Ms. Fallin was peculiarly available to Mr. Harris and would be expected to favor him in any testimony. In addition to the family relationship cited by the Circuit Court, the intermediate appellate court noted that:

(1) Ms. Fallin allowed Mr. Harris to live with her from November 2013 through January 2015 without paying rent;

(2) Mr. Harris had given his mother $75,000 from a worker's compensation settlement that he had received for his injured hand in 2008 or 2009 – approximately six years before the trial;

(3) Ms. Fallin attended the court proceedings on the first day of trial and had brought clothes for Mr. Harris.

2017 WL 168446 at *11.[27]

Of the additional facts cited by the Court of Special Appeals, only items 1 and 2 were known to the jury from testimony. (As to item 1, the intermediate appellate court apparently mis-read the record, as the end date should have been January *2014* rather than January 2015 and his period of residence two months rather than 14 months. Mr. Harris

---

[27] The intermediate appellate court numbered some of these items differently in its opinion. The Court of Special Appeals also noted that Mr. Harris had testified that Ms. Fallin was the only person who could corroborate his alibi. However, that fact appears to concern whether her testimony would be important, rather than whether she was peculiarly available to him rather than the State.

was arrested in February 2014 and remained in custody as of the time of trial in January 2015). The events cited in items 1 and 2, which preceded the trial by one year and six years, respectively, seem to add little to the idea that Ms. Fallin was "peculiarly available" to Mr. Harris besides the fact that she was his mother.

Item 3 – Ms. Fallin's presence in the courtroom and the possibility that she or Mr. Harris' estranged wife would bring clothes for him[28] – was discussed outside the presence of the jury. A court may well decline to give a missing witness instruction based on information not before the jury – *i.e.*, the likelihood that the witness would invoke the Fifth Amendment right to remain silent. However, it would be odd for a court to tell a jury that it may draw an inference adverse to one party if it finds that the witness is peculiarly available to that party when the information on which the court believes such an inference could be based is unknown to the jury.

Not listed among the additional facts considered by the Court of Special Appeals was other evidence elicited at the trial that suggested that Ms. Fallin might *not* be peculiarly available to Mr. Harris. For example, she had cooperated with the police and consented to a search of her home, and she had apparently asked Mr. Harris to leave her home sometime in 2014.

In any event, the Circuit Court cited none of the additional facts listed by the Court of Special Appeals. Nor did the prosecutor refer to them when he argued for the instruction

---

[28] Although there was a discussion between the court and counsel as to whether the wife or Ms. Fallin would bring clothes for Mr. Harris, the record does not indicate whether either of them actually did so.

during the jury instruction conference.  The prosecutor's request for the instruction was based solely on the fact that Ms. Fallin had been mentioned in opening statement; the Circuit Court's decision to give an instruction inviting the jury to draw an inference adverse to Mr. Harris from her absence appeared to be based only on the family relationship between Ms. Fallin and Mr. Harris.

In a case involving similar circumstances, the Court of Special Appeals held that it was error to give a missing witness instruction.  In *Dansbury v. State*, 193 Md. App. 718 (2010), the defendant, who was charged with rape, testified in his own defense that he had a consensual sexual encounter with the alleged victim.  According to the defendant's version, his mother and aunt, among others, were witnesses to the events surrounding that encounter.  However, neither the mother nor the aunt were called as witnesses at the trial. The trial court *sua sponte* decided to give a missing witness instruction adverse to the defendant without considering, aside from their family relationship, whether the missing witnesses were peculiarly available to the defendant.  Following his conviction, the defendant appealed.  The Court of Special Appeals held that the trial court had abused its discretion in giving the missing witness instruction and reversed the conviction.  Among other things, the intermediate appellate court noted that the trial court had not followed the "preferred procedure" set forth in *Christensen*, that the aunt and mother had been outside the courtroom during the trial and thus physically available to both sides, and that there

had been no finding that they were "peculiarly available" to the defendant. 194 Md. App. At 748-50.[29]

*The Instruction Given*

The missing witness instruction that was given at trial in this case tracked the model instruction currently found in Maryland State Bar Association, Maryland Criminal Pattern Jury Instructions (2d ed. 2012) MPJI-Cr 3:29.[30] In that instruction, the Circuit Court made specific reference to Ms. Fallin and told the jury that, if she "was peculiarly within the power of [Mr. Harris] to produce" but was not called as a witness – she was not – and if her absence was "not sufficiently accounted for or explained" – there was nothing before the jury as to why she was absent – then the jury could "decide that [her] testimony … would have been unfavorable to [Mr. Harris]." No direction was given to the jury as to how it should determine whether Ms. Fallin was "peculiarly within the power" of Mr. Harris. "Unfavorable" in this context – where the jury was called upon to determine

---

[29] Assuming for the sake of argument that a family relationship alone could establish that a witness is peculiarly available to one side, the Court of Special Appeals noted that the instruction in that case had included other potential defense witnesses and had not referred to potential prosecution witnesses. 193 Md. App. at 749. The intermediate appellate court also questioned an underlying premise for a missing witness instruction – *i.e.,* whether the "missing witnesses" would actually have any relevant testimony to give. *Id*. at 749-50.

[30] A somewhat different model appears in another treatise on Maryland criminal jury instructions and ends with the admonition that "You must remember that a defendant is not obligated to produce any evidence or call any witnesses." 1 David E. Aaronson, Maryland Criminal Jury Instructions and Commentary (2017 ed.) at §2.59(A). Interestingly, no missing witness instruction appears in the model civil jury instructions. *See* Maryland State Bar Association, Maryland Civil Pattern Jury Instructions (5th ed. 2017).

whether Mr. Harris was present at Ms. Binko's apartment on January 16, 2014 – could only mean that Ms. Fallin would not back up Mr. Harris' testimony that he had spent that evening with Ms. Fallin.

Boiled down to its essence, the missing witness instruction invited the jury to disbelieve Mr. Harris' testimony if it concluded that Ms. Fallin was "peculiarly within his power" to produce, however it might understand that condition. The instruction also could have led the jury to believe, incorrectly, that Mr. Harris bore a burden of proof in presenting an alibi defense.[31]

*The Missing Witness Inference in the State's Argument*

As alluded to earlier, there are cases in which it may be appropriate for the prosecutor to ask the jury to draw a missing witness inference, even though the court should not endorse that particular inference in its instructions. This is such a case. In his opening statement in this case, defense counsel had told that jury that he would present an alibi through the testimony of Ms. Fallin. When the defense substituted the defendant as its witness on his whereabouts, it was fair game for the prosecutor to point out that the defense had not presented the evidence from Ms. Fallin that it had promised, as it would have been

---

[31] An alibi is not an affirmative defense but simply negates an element of the crime – *i.e.,* criminal agency, an element of the crime that must be proven by the State. The defendant does not bear the burden of proof on that issue. *In re Parris W.*, 363 Md. 717, 728-29 (2001); *Simms v. State*, 194 Md. App. 285, 308 (2010), *aff'd*, 420 Md. 705, 722 (2011).

41

fair game for the prosecutor to spotlight any other discrepancy between what the defense promised and what it produced.[32] However, it is not fair game for the trial court to do so.

*Summary*

It is frequently said that we presume that trial judges know and apply the law in making rulings and rendering decisions, unless we have reason to think otherwise. *E.g., Medley v. State*, 386 Md. 3, 7 (2005) ("[A]bsent a misstatement of law or conduct inconsistent with the law, a trial judge is presumed to know the law and apply it properly.") (citations and internal quotation marks omitted). There is perhaps reason to think otherwise in this case. One would expect a trial court that knew and understood the law to follow the "preferred procedure" set out in *Christensen* and to be "especially cautious," as advised in *Davis*, when the idea of a missing witness instruction adverse to the defendant is broached. Instead, it appears from the record that it was the Circuit Court, rather than the parties, that initiated the idea of a missing witness instruction. There was apparently no effort to adhere to the "preferred procedure" for considering such an instruction adverse to a defendant. In deciding whether to give the instruction, the trial court relied solely on the fact that Ms. Fallin was the mother of Mr. Harris.

The instruction should not have been given in this case. We agree with observations made by Judge Nazarian in his dissent in the Court of Special Appeals:

---

[32] Presciently, during a pretrial conference concerning how the attorneys would describe the physical condition of Mr. Harris' left arm and hand in opening statements, defense counsel observed: "[I]t's been my experience that whenever I've made a statement – a proffer to the jury in opening statements – and I haven't been able to back that up, it has come back to bite me very hard."

The State, not Mr. Harris, bore the burden of proof in this case, and Mr. Harris was not obligated (even if it might have bolstered his defense) to corroborate independently his sworn testimony about his whereabouts. The State had the same opportunity to subpoena Ms. Fallin as Mr. Harris did, and didn't ask for the opportunity to subpoena and call her as a rebuttal witness when it learned that Mr. Harris wasn't going to call her. There is no dispute that the State was entitled in closing to note her absence or to question the veracity of Mr. Harris's testimony, and that the jury would be entitled to disbelieve him. But it is another thing altogether to have the *court instruct* the jury, as it did here, that Ms. Fallin's absence from the witness stand permits the jury to infer that the testimony would have been unfavorable to the party who failed to call such witness, especially without first following the "preferred procedure" of advising the parties of its intention to give the charge at the close of defense's case. Under these circumstances, the judicial thumb on the scale was not warranted …

*Harris v. State*, 2017 WL 168446 at \*15 (January 17, 2017) (Nazarian, J., dissenting) (quotation marks and citations omitted).

We do not rule out the possibility that there may be the rare criminal case in which a missing witness instruction adverse to a defendant may be appropriate, although it is difficult to foresee what those circumstances might be. Such an instruction should rarely, if ever, be given. *See State v. Hill*, 974 A.2d at 416 ("Although we will not engage in hypothetical discussions of possible situations in which a negative inference might be argued to arise, suffice it to say that it would be a rare case").

*Whether the Error was Harmless*

Under Maryland Rule 8-131(b),[33] we consider whether the error in giving the missing witness instruction was harmless. An error by trial court is harmless only if a

---

[33] Maryland Rule 8-131(b) provides, in pertinent part:

reviewing court "is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict." *See Dorsey v. State*, 276 Md. 638, 659 (1976).

This was a close case[34] in which the missing witness instruction concerning Ms. Fallin might well have been a critical factor, as evidenced by the fact that the jury deliberations lasted nearly as long as the presentation of evidence[35] and one of the jury questions asked for Ms. Fallin's address. While Mr. Harris' alibi was uncorroborated, the bulk of the evidence at trial tended to undermine his identification as the suspect. Neither Ms. Binko nor Ms. Holmes nor Mr. Allen identified him as the unmasked robber called Black. Nor was there any indication that the elusive Reds, were she ever found, would tie him to the crime.

Mr. Harris testified that his left arm had limited functionality and that he could not grasp items. The Circuit Court acknowledged that Harris's left arm was visibly "not quite normal or regular." This was inconsistent with the fact that, according to Ms. Binko, Black used both his hands without difficulty during the robbery and their struggle. Moreover, the

---

> Whenever an issue raised in a petition for certiorari … involves, either expressly or implicitly, the assertion that the trial court committed error, the Court of Appeals may consider whether the error was harmless or non-prejudicial even though the matter of harm or prejudice was not raised in the petition ….

[34] In a pretrial conference, the prosecutor candidly conceded that he had his own "reservations" about the strength of the State's case, and the Circuit Court characterized the case as "an uphill battle" for the prosecution.

[35] Opening statements began mid-morning on Wednesday, January 7, 2015 and closing statements concluded mid-afternoon the next day, at which time the jury began deliberating. The deliberations continued into Friday, January 9, until the jury returned its verdict mid-afternoon that day.

evidence established that Mr. Harris and the victims did not know each other, raising the question as to how he would know that there would be cash and Oxycodone at the apartment.

The only evidence linking Mr. Harris to the scene of the crime was the fingerprint match made by the latent print examiner. In *Reed v. State*, 283 Md. 374, 380 (1978), this Court observed that fingerprint identification was among the category of scientific techniques that were "so broadly and generally accepted in the scientific community that a trial court may take judicial notice of its reliability." An acknowledgement of the general reliability of fingerprint evidence does not mean that we presume its infallibility. While the latent print examiner's testimony raises questions about how Mr. Harris' fingerprints ended up on the pill bottles, it is hardly conclusive that he participated in the armed robbery.

In any event, we need not be convinced that Mr. Harris is innocent. Rather, to find the error harmless, we must be convinced that it did not influence the verdict beyond a reasonable doubt. The viability of Mr. Harris' defense hinged on his credibility, especially with respect to his alibi. As indicated earlier, a missing witness instruction can invite a jury to draw an unreliable inference from the imagined testimony of an absent witness. We conclude that the decision to give a missing witness instruction in this case was not harmless beyond a reasonable doubt. *See Dansbury*, 193 Md. App. at 750-55 (missing witness instruction not harmless error in light of importance of defendant's credibility to defense).

*C.*	*Post-Arrest Silence and Harmless Error*

The Court of Special Appeals held that the Circuit Court erred in admitting Detective Gaskins' statement that Mr. Harris had requested an attorney during their interview. However, the intermediate appellate court found that error to be harmless as it felt able to declare beyond a reasonable doubt that the Circuit Court's error did not affect the verdict. The Court of Special Appeals reasoned that there was only a brief reference during the detective's testimony to Mr. Harris' request for counsel, that the request was not mentioned during the remainder of the trial, that neither counsel referred to it in argument, and that the fingerprint testimony was "compelling evidence" of Mr. Harris' guilt.

We agree with the Court of Special Appeals that it was an error to allow Detective Gaskins to testify that Mr. Harris had requested counsel during a custodial interview. *See Lupfer v. State*, 420 Md. 111, 119-20 (2011). In light of the fact that we are reversing the convictions in this case for other reasons, we need not decide whether that error was harmless. We trust that, at any retrial that may occur after remand of the case to the Circuit Court, the prosecution will not elicit testimony from Detective Gaskins concerning Mr. Harris' invocation of his right to counsel.

**IV**

**Conclusion**

For the reasons set forth above, we hold that the Circuit Court should not have given a missing witness instruction adverse to the defendant concerning the absence of Ms. Fallin as a witness.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT FOR ENTRY OF AN ORDER VACATING PETITIONER'S CONVICTIONS AND REMANDING THE CASE TO THE CIRCUIT COURT OF BALTIMORE CITY FOR A NEW TRIAL. COSTS TO BE PAID BY RESPONDENT.**

47

Circuit Court for Baltimore City
Case Nos.: 114069007, 114069008
           114069009, 114069010
Argued: October 11, 2017

IN THE COURT OF APPEALS

OF MARYLAND

No. 9

September Term, 2017

_____

JERRY HARRIS

v.

STATE OF MARYLAND

_____

Barbera, C.J.
Greene
Adkins
McDonald
Watts
Hotten
Getty,

JJ.

_____

Concurring and Dissenting Opinion by Adkins, J.

_____

Filed: April 12, 2018

Most respectfully, I dissent from the Majority's holding that the trial court abused its discretion by giving the missing witness instruction. It is well settled that we review the trial court's decision to grant a jury instruction under an abuse of discretion standard. *Atkins v. State*, 421 Md. 434, 446 (2011). In describing this standard, we have said:

> Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously. Where the decision or order of the trial court is a matter of discretion it will not be disturbed on review except on a clear showing of abuse of discretion, that is, discretion manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons.

*Id.* at 447 (cleaned up). *See also Robinson v. State*, 315 Md. 309, 318–19 (1989) (provided that there is a "sufficient foundation of facts" to support the inference, "it will ordinarily be within the discretion of the trial judge to grant or refuse a missing witness instruction").

The trial court here exercised its discretion to give the missing witness instruction to the jury on the articulated basis that Ms. Fallin was Mr. Harris's mother. It has been said many times, and in many ways, that there is no stronger human bond than that between a parent and child.[1] This common-sense wisdom, in large part, explains why the trial judge

---

[1] *See, e.g.*, Andrew Solomon, *Far From the Tree: Parents, Children and the Search for Identity* 6 (2012) ("The parental predisposition to love prevails in the most harrowing of circumstances."); *see also* S. Austin Allibone, *Prose Quotations From Socrates to Macaulay* 482 (1880) ("'[A] mother's love endures through all . . . .' Washington Irving"); Henry Ward Beecher, *The Sermons of Henry Ward Beecher in Plymouth Church, Brooklyn* 58 (1872) ("There is no friendship, no love, like that of the parent for the child."); James. E. Faust, Second Couns. in the First Presidency, Dear are the Sheep that Have Wandered, Sermon before the April 2003 General Conference of The Church of Jesus Christ of Latter-Day Saints (Apr. 6, 2003) (transcript available at https://perma.cc/44BW-WNBZ) ("The depth of the love of parents for their children cannot be measured. It is like no other

acted well within her discretion in giving the missing witness instruction to the jury. Indeed, we observed in *Christensen v. State*, 274 Md. 133, 134–35 (1975), that the missing witness inference is commonly applicable between family members.

The party seeking application of the missing witness instruction must show that "'the missing witness was peculiarly within the adversary's power to produce by showing either that the witness is physically available only to the opponent or that the witness has the type of relationship with the opposing party that pragmatically renders his testimony unavailable to the opposing party.'" *Bereano v. State Ethics Comm'n*, 403 Md. 716, 742 (2008) (quoting *Chicago Coll. of Osteopathic Med. v. George A. Fuller Co.*, 719 F.2d 1335, 1353 (7th Cir. 1983)). One element of this showing is a relationship of "interest or affection." *Woodland v. State*, 62 Md. App. 503, 510, *cert. denied*, 304 Md. 96 (1985).

Here, the trial judge had more than the naked parental status to support her instruction. Mr. Harris lived with his mother from November 2013 until January 2014 without paying rent; in 2008 or 2009 he gave his mother $75,000 from a workers' compensation settlement and had given her money at other times. She was absent the day the defense presented its case, even though defense counsel had told the jury she would offer an alibi. Mr. Harris testified that he had been at his mother's home on January 16, 2014, the night of the robbery. All of these facts support the trial judge's discretionary decision to grant the missing witness instruction.

---

relationship. It exceeds concern for life itself. The love of a parent for a child is continuous and transcends heartbreak and disappointment.").

The Majority discounts the closeness and strength of this parental relationship, citing Ms. Fallin's consent to the police searching her home. In doing so, I submit, the Majority improperly invades the province of the trial judge. A reasonable trial judge could certainly conclude that Ms. Fallin gave her consent for reasons other than disinterest in her son's welfare—such as fear of what the police would do if she refused. We should not reverse that decision based on our view of why she gave her consent.

In holding that the trial court erred in giving the missing witness instruction the Majority relies in large part on "developments in constitutional law, changes in the rules of evidence and discovery, and questions concerning the accuracy of the adverse inference promoted by the missing witness rule . . . ." Maj. Slip Op. at 16. To be sure, the constitutional implications, and the policy concerns reflected in the abandonment of the rule in other states are fair reasons to question the wisdom of the missing witness rule. I do not disagree with these points, and maybe, eventually jettison of the rule will prove to be the correct course.

But the Majority does not abandon the missing witness rule—it only cabins the rule to "the rare criminal case in which a missing witness instruction adverse to a defendant may be appropriate . . . ." Maj. Slip Op. at 43. In my view, if such a case exists, this is it. The parental bond, living arrangement, and prior financial dealings together with the opening statement promising Ms. Fallin as an alibi witness, combine to create a circumstance that more than justified the trial court's discretionary decision.

The Majority's rationale and holding leaves litigants, lawyers and trial judges without appropriate guidance from this Court. For example, it is difficult to know how

3

much weight the Majority gives to the trial court's failure to announce in full detail all of its reasons for its decision to give the instruction. Further, I am not persuaded that imposing a strict requirement that the trial court announce all of its reasons for giving this or any instruction is wise. Such a policy invites error by our trial judges, who are without the luxury of deliberative written decisions in the midst of trial.

I also disagree with the Majority's statement that the justification for the missing witness rule is "questionable" because trial lawyers prefer to try a "lean" case—particularly as applied here. Maj. Slip Op. at 21. In this trial, defense counsel promised the jury that Ms. Fallin would testify that Mr. Harris was with her the entire night of the crime. Surely, defense counsel did not scrap Ms. Fallin's testimony merely because it was cumulative, or the jury was fatigued. Nor is it likely that, after promising the jury Ms. Fallin would provide an alibi, he abdicated her testimony because of an eleventh-hour decision that her demeanor was poor.

*Christensen* fails to bolster the Majority's position. The Majority is simply wrong in stating that "the Circuit Court did not follow the 'preferred procedure' set forth in *Christensen*." Maj. Slip Op. at 35. That case enunciated a "preferred procedure" for use of the missing witness instruction, directing that the party opposing the instruction be afforded the opportunity to either call the "designated witness or demonstrat[e] to the court by argument or proof the reason for the failure to call." *Christensen*, 274 Md. at 135 & n.1 (quoting *State v. Clawans*, 183 A.2d 77, 82 (N.J. 1962)). Under the *Christensen* procedure, the party seeking the instruction should bring the request to the court and opposing counsel at the close of opposing counsel's case, outside of the presence of the jury. *Id.* at 135 n.1.

4

*Christensen* does not require **pretrial** notice. Here, the prosecutor asked for the missing witness instruction shortly after the close of the defense case during the normal time for court and counsel to discuss jury instructions. Indeed, it would have been difficult for the prosecutor to ask for the instruction any earlier—when defense counsel had indicated at the close of the previous day's proceedings that Ms. Fallin was present and ready to testify.

Certainly the defense had the opportunity to "demonstrat[e] to the court by argument," *id.*, the reason for the failure to call Ms. Fallin. Defense counsel argued clearly against the missing witness instruction, but never offered a plausible reason for Ms. Fallin's absence that day:

> [**Defense Counsel**]: Well, it says, your Honor, that if a witness was peculiarly within the power of the State or the defendant to produce but was not called as a witness. The State never requested a subpoena for Ms. Fallin.
>
> **The Court**: No, it's by the State or the defendant.
>
> [**Defense Counsel**]: Right. I didn't call to request a subpoena for her. I just—you know **there's multiple reasons why she's not here, none of which are pertinent to the issue**.
>
> **The Court**: Okay. Okay. If a witness could have given important testimony in issue with this case—and I imagine an alibi would be considered important testimony—and if the witness was peculiarly in the power of the defendant to produce—which she was, it's his mother—but was not called as a witness by the defendant, and the absence of that witness was not sufficiently accounted for or explained—which it was not—then you may decide that—I mean, how is this not applicable?
>
> [**Defense Counsel**]: Because it's not peculiarly within his power. He's in jail. He doesn't have the power to do anything—

5

> **The Court**: Right.  You are acting as his agent, [Defense Counsel]
>
> [**Defense Counsel**]: True.
>
> **The Court**: Okay.  So **you had the ability to either bring her here or subpoena her here as an alibi witness**.  The objection is overruled.  3.29 missing witness instruction is being read.

(Emphasis added).

The reasons for Ms. Fallin's absence may have been unrelated to the trial.  But defense counsel did not offer any explanation for her absence, even when given plenty of leeway from the judge to offer a plausible reason for the same.  I find no violation of *Christensen.*

### Post-Arrest Silence and Harmless Error

There is another, unrelated, reason for reversal based on the police officer's testimony about Mr. Harris's post-arrest silence and the defendant's giving a false address to the police.  An accused's pre- and post-arrest silences are inadmissible under Maryland evidentiary law[2] as substantive evidence of guilt.  *See Weitzel v. State*, 384 Md. 451, 461 (2004) (pre-arrest silence); *Kosh v. State*, 382 Md. 218, 233–34 (2004) (post-arrest silence).[3]

---

[2] Although the use of an accused's silence presents issues under the United States Constitution and the Maryland Declaration of Rights, Maryland courts primarily address these issues through Maryland's Rules of Evidence.  Only if the evidence is "proper as a matter of Maryland evidentiary law," through Maryland Rules 5-401 and 5-402, does a court address whether the evidence is constitutionally permissible.  *See Dupree v. State*, 352 Md. 314, 323–24 (1998); *see also State v. Raithel*, 285 Md. 478, 484 (1979).

[3] There are some narrow exceptions.  For example, an accused's silence may be admissible through "opening the door."  As we explained in *Grier v. State*, 351 Md. 241,

I agree with the Majority that it was an error to allow Detective Gaskins to testify that Mr. Harris had requested counsel during a custodial interview. *See Lupfer v. State*, 420 Md. 111, 124–25 (2011). Without a knowing and voluntary waiver of his constitutional rights, his responses to interrogation were not admissible. *Hughes v. State*, 346 Md. 80, 87 (1997).

The Majority elects not to decide whether the error was harmless. I take this second step and examine the record for such purpose. The State used Gaskins's testimony as part of its case in chief. The prosecutor established that Gaskins had sought a warrant for Mr. Harris's arrest after learning that the print examiners had matched Mr. Harris's fingerprints to the prints found on the prescription bottles. Then the prosecutor asked Gaskins whether he "attempt[ed] to interview Mr. Harris" and "[w]hat, if anything, occurred during that interview[.]" Gaskins testified that Mr. Harris had "provided us with a false address, denied any involvement with the robbery, and then . . . he requested an attorney."[4] That request is inextricably linked with the notion that Gaskins believed Mr. Harris to be guilty. Putting Mr. Harris's request for an attorney before the jury, regardless of his claim of innocence, left the inference of guilt "dangling for the jury to grab hold." *Dupree v. State*,

---

260 (1998), "otherwise irrelevant evidence may be admitted when the opposing party has 'opened the door' to such evidence." In *United States v. Robinson*, 485 U.S. 25, 32–34 (1988), the Supreme Court concluded that a prosecutor may be permitted to offer a "fair response" when defense counsel claimed that the government had unfairly prevented the defendant from telling his side of the story.

[4] The Majority observes that Mr. Harris provided his former address, Maj. Slip Op. at 7, and Mr. Harris testified that it was the one on his driver's license. There is no information in the record whatsoever that explains why Detective Gaskins thought it was a false address.

352 Md. 314, 333 (1998). The jury may well have reasoned that if Mr. Harris really was innocent, he would have been willing to talk to the police to clear his name.

I agree with the Majority that "the viability of Mr. Harris's defense hinged on his credibility . . . ." Maj. Slip Op. at 45. During deliberations, the jury requested "the addresses for wife, mother, and what was on his driver's license." This request suggests that they were weighing whether Gaskins's testimony that Mr. Harris had given a false address was indeed accurate, and thus Mr. Harris's credibility. *See Porter v. State*, 455 Md. 220, 253–54 (2017); *Hunter v. State*, 397 Md. 580, 597 (2007). It is quite possible that Gaskins's testimony was intentionally introduced to shore up the State's case while undermining the value of any testimony Mr. Harris might offer. In *Kosh*, 382 Md. at 234, we concluded that an improper mid-trial instruction notifying the jury that the defendant had kept silent "effectively impeached" defense witnesses before they testified. Here, the State effectively impeached Mr. Harris's testimony when it introduced his silence to law enforcement before he testified.

In *Coleman v. State*, 434 Md. 320, 345 (2013), when discussing the prejudicial effect of defense counsel's failure to object to police testimony about the defendant's silence, this Court stated that "because the improper admission of evidence of post-*Miranda* [*v. Arizona*, 384 U.S. 436 (1966)] silence 'is so egregious and so inherently prejudicial, reversal is the norm, rather than the exception.'" (quoting *Alston v. Garrison*, 720 F.2d 812, 817 (4th Cir. 1983)). In *Younie v. State*, 272 Md. 233, 248 (1974), we explained that "[t]he harmless error rule, as it pertains to the [F]ifth and [S]ixth Amendments, has been and should be carefully circumscribed . . . ." This is because:

> Continued expansion of the harmless error rule will merely encourage prosecutors to attempt to get such testimony in, since they know that, if they have a strong case, such testimony will not be considered to be reversible error, yet if they have a weak case, they will use such testimony to buttress the case to gain a conviction and then hope that the issue is not raised on appeal.

*Id.* (quoting *People v. Jablonski*, 195 N.W.2d 777, 780 (Mich. Ct. App. 1972)).

To be sure, a single reference to a defendant's invocation of his Fifth Amendment rights is not always prejudicial error. But the State should not be permitted to introduce inadmissible and prejudicial evidence—even once—without risking a reversal if the circumstances warrant it. As the Majority observed, the evidence in this case made it a close call. *See* Maj. Slip. Op. at 43–45. I conclude that admitting this testimony was not harmless beyond a reasonable doubt. *See Dorsey v. State*, 276 Md. 638, 659 (1976).

## CONCLUSION

I concur in the judgment vacating Mr. Harris's convictions and remanding for a new trial—because the reference to his request for an attorney was not harmless error. I would hold that the trial court acted within its discretion in issuing the missing witness instruction under the circumstances of this case.

9